OF

## NEW-YORK.

------◆------

### HEYER v. BURGER et al.

WHERE husband and wife separate, under circumstances entitling her to file a bill for a separation, and articles of separation are executed, whereby the former relinquishes all rights to her property, and the same becomes vested in a trustee, to be enjoyed by her with a power of appointment by will, and she afterwards dies, the husband cannot, (no creditors intervening,) set the articles aside.

Although the Revised Statutes of New-York have prohibited a will by a married woman, of personal as well as real estate, yet where the husband assents to her disposing of the former, the will will be good. This may be by a post-nuptial agreement, as well as an ante-nuptial one: otherwise as to real estate. Where the property is given by another, with the power to will, it is immaterial whether the gift is before or after marriage, or whether there is any assent by the husband.

Reconciliation does away with articles of separation; but a casual intercourse between man and wife upon a mere friendly footing

1839.

Heyer
v.
Burger et al.

for three or four days, and loose expressions relative to an in-
tention to destroy articles of separation in the hands of a trustee,
and the expression of a wish that they had not been made, will
not be proof of a permanent reconciliation and agreement to live
together, so as to set aside the articles.

The surrogate's court has sole jurisdiction to try the validity of a
will of personal estate.

Although it is a rule of this court that, where there is a full remedy
elsewhere, the objection should be taken in a pleading, and not
merely at the hearing, yet this does not hold where another
court has exclusive jurisdiction by statute or otherwise. In such
a case, the court may raise the objection. Nor would the consent
of counsel, that the court should take cognizance, confer juris-
diction.

The Revised Statutes, in requiring a testator, at the time of making
his subscription, or his acknowledgment of the same, to "declare
" the instrument so subscribed to be his last will," intend an act
distinct from subscription, acknowledgment of subscription, and
from attestation : something synonymous with publication.
Therefore, where a proposed will was read to a party who, by
her answer, recognized it as containing her wishes, and then
made her mark, but did not speak more, *it was considered* that
the instrument was not perfected as a will.

A will executed by a wife under a power, need not refer to it.

June 5.
July 1.

ANDREW HEYER, the complainant, married Sarah Heyer,
now deceased, in the year 1825 or 1826. She was at that
time in possession of certain real estate, which had be-
longed to her former husband, of a leasehold interest in a
house and lot in New-York, and of certain personal estate.

In consequence of violent and abusive conduct on the
part of the complainant, a separation was agreed upon,
and articles to that effect were executed in the month of
May, 1832. The date being omitted, the time of the exe-
cution is fixed by the testimony to have been the 23d of
May.

The agreement was made between Andrew Heyer, of
the first part, Sarah A., the wife of the said Andrew, of
the second part, and Abraham Garritson, of the third part.
It recited that the said Sarah, previous to her intermarriage
with the said Andrew, was possessed of certain real and
personal estate ; that some unhappy differences had arisen

between them, and they had mutually agreed to live separate and apart from each other, and the said Andrew had consented and agreed that the said Sarah should take and retain whatever estate and property she had or was possessed of previous to her marriage, and might apply the same, and the income thereof, to her sole maintenance and support: provided, however, that she should not at any time thereafter call upon or apply to the said Andrew for any assistance or support, nor contract any debt or debts in his name or on his account. The said Andrew Heyer then covenanted with the said Abraham Garritson, his executors, administrators or assigns, and also agreed with his said wife in manner and form following, that is to say, that it should be lawful to and for the said Sarah his wife, and that the said Andrew should suffer and permit the said Sarah, to live separate and apart from him, and to reside in such place and places, and in such family or families as the said Sarah, from time to time, at her will and pleasure, should think fit. And that he, the said Andrew, should not at any time molest, disturb or trouble the said Sarah for so living separate and apart from him, nor compel her to cohabit with him, nor sue, molest or disturb any other person or persons for receiving, harboring or entertaining her, and should not claim or demand any money, goods or property, which she, the said Sarah, had or should at any time thereafter have or acquire.

. And the said Sarah on her part covenanted with the said Abraham Garritson, and with her said husband, that she would not at any time thereafter molest, annoy or disturb the said Andrew, or contract any debt or debts in his name or on his account, nor ask for or demand any other support or maintenance than what is therein provided. For the further fulfilment and performance of the aforesaid understanding and agreement, they, the said Andrew Heyer and Sarah his wife, in consideration of the premises, and also in consideration of one dollar, granted, bargained, sold and assigned unto the said Abraham Garritson, and to his heirs and assigns forever, all and singular the house, land and premises, situate at Castleton, on Staten

Island, formerly owned by Henry Davis, the first husband of the said Sarah, and also all and singular the personal property, debts, choses in action, sum and sums of money belonging to, possessed or owned by the said Sarah previous to her intermarriage with the said Andrew. To have and to hold the same, and every part and parcel thereof, with the appurtenances, unto the said Abraham Garritson, his executors and administrators forever. In trust, nevertheless, that during the joint lives of them, the said Andrew and Sarah, the income to be derived from the said property, and every part thereof, and also the principal (if necessary,) should be applied for the sole support and maintenance of her, the said Sarah, and shall be paid and delivered to her from time to time, as she might require. And upon the further trust, that if she should survive him, the said Andrew, then that he, the said Abraham Garritson, should immediately after the decease of the said Andrew, convey, assign and transfer to the said Sarah, whatever property or estate shall then remain in the hands of him, the said Abraham Garritson, by virtue of such indenture. And if the said Andrew should survive the said Sarah, then upon the trust that immediately after the decease of the said Sarah, he, the said Abraham Garritson, should convey and assign whatever property should remain in his hands, by virtue of such indenture, to such person or persons as she, the said Sarah, might in her last will and testament designate; and in default of her making such will, then to her lawful heirs.

On the 31st August, 1832, Mrs. Heyer died, having made a will on the same day, by which she gave unto her father Peter Sanders, one third part of her real and personal estate, and unto her three sisters Eliza Garritson, the wife of Abraham Garritson, Eliza Johnson, wife of Richard Johnson, and Letty Christopher, wife of John Christopher, the remaining two thirds of her real and personal estate, to be equally divided among them, share and share alike.

She appointed David Burger, of Castleton, and Abraham Garritson, of the same place, executors of her will.

The will was duly proven before the surrogate of Richmond county, and letters granted to the executors on the 8th of October, 1832.

*H. M. Western,* for complainant.

*G. Clark,* for defendant.

THE ASSISTANT VICE-CHANCELLOR :—The bill is filed by the husband for the purpose of having the articles of separation declared void in themselves; that if originally valid, they have been abrogated and were not in force at the date of the will; hence to establish that the will was inoperative ; impeaching it also on the ground of incapacity; and calling upon the executors to deliver and pay over the personal property, or avails of personal property, in their hands.

The bill calls for an answer under oath.

The first branch of the cause relates to the articles of separation. The second to the validity of the will.

I. As to the validity of these articles, it has been urged by counsel that no separate estate in the wife is created by this instrument, and none could therefore be devised or bequeathed, referring to various cases stated by Mr. Clancy. But in those and other similar cases, the question has arisen between the husband or the husband's creditors, and the wife or her trustees ; and it has been whether she shall have the whole fund, or he or they shall participate in it ; for this court will in no case take it wholly from her. (*Roberts* v. *Spicer,* 5 *Mad. Rep.* 491. *Richard* v. *Amos,* 1 *Turn. & Russ.* 222.) Here the husband relinquishes all his rights, and no creditors intervene.

Next in relation to this instrument, it is said that it was never consummated ; never delivered to the trustee, nor acted upon by him. As to this point, the answer of the defendants appears to me conclusive. It is strictly responsive to a direct charge that the articles were never delivered to the trustee, but remained in possession of Mrs. Heyer until after her death ; and it avers that the instru-

ment was delivered to the trustee, and that he subsequently permitted Mrs. Heyer to take it to show to counsel. Garritson, the trustee, is a defendant, and swears to the answer. I can have no doubt on this point.

Another question has suggested itself, whether the trust is a valid one? The trust is here to apply to the use of Mrs. Heyer, and to pay and deliver over to her the income of real and personal estate. It has been much questioned whether a trust to pay to the party is within the provision authorizing a trust to apply income to the use of the beneficiary. The latest authority upon this point is that of *Gott* v. *Cooke,* before Chancellor Walworth, who held such a trust valid. Besides the only income here in question, arises from personal property. It has never been decided that the statute regulates trusts of personalty in this particular. Chief Justice Savage, in a very elaborate opinion, holds the contrary; and I apprehend that if the trust is good as to personal estate, it would not be vitiated even if united with a trust void as to real.

Another and much more important question arises as to the validity of the articles, upon the principles of the court resulting from its views of public policy.

On many occasions Lord Eldon has expressed his strong opposition to this court sustaining or enforcing contracts for a separation. (*St. John* v. *St. John,* 11 *Vesey,* 532.)

But it seems to me that there is enough in this case to bring it within the verge of unquestioned decisions. There was sufficient ground for a bill for a separation. There is a covenant with Garritson, the trustee, that the wife should live separate, that he would not compel cohabitation or molest her, or claim any money, goods or property which she possessed or might acquire, followed by an absolute conveyance to the trustee of all her property. (See the cases 2 *Story's Comm.* 652—4. *Roper on Husband and Wife,* vol. ii. p. 291 *et. seq.* *Rogers* v. *Rogers,* 4 *Paige,* 516. *Westmeath* v. *Salisbury,* 5 *Bligh's Rep.* 339.)

That the power given to the wife to make a will is good, is also clear. Indeed such a power is incidental to a sepa-

rate estate, without being expressly conferred. (*Rich* v. *Cockell*, 9 *Vesey*, 369.)

Sometimes such an instrument has been termed a testamentary disposition in the nature of a will ; at others a proper will. (*Ross* v. *Ewer*, 3 *Atk.* 160, note.) At any rate, it has long been law, that such a disposition of personal estate, with the assent of the husband, was valid ; and the reason given for requiring his assent is, that as the wife's chattels belong to the husband, his interest precludes an alienation by her. (*Toller's Law of Executors*, 10, *and cases cited.*)

Although the Revised Statutes preclude a married woman from making a will of personal as well as real estate, while the statutory restriction was previously limited to real estate, yet I see no ground in this for a supposed change in the rule, that a bequest may be permitted under an authority from the husband. And perhaps the distinction is, that as to real estate no post-nuptial agreement can authorize her will, because her heirs are concerned ; while as to personal estate, a post-nuptial agreement is as available as one made before marriage. (See *Marston* v. *Norton*, 5 *N. Hampshire Rep.* 255. 477.) But whether the agreement is before or after marriage, or whether there is any agreement, is immaterial, where the property is given by another with a power to dispose of it by will.

The next topic of consideration is as to the alleged reconciliation of the parties and of its effect upon the articles. By the testimony of Metcalf, it is rendered certain that Mrs. Heyer considered the articles in full force about the beginning of July, 1832. She exhibited them to him to consult about her right to sue Evertson.

The testimony as to a reconciliation refers to acts in the course of that month. Heyer went to sea on the 3d or 4th of August.

James Smith saw the parties together at his house in Cherry-street, in July. She was there about six or seven days, and he saw her about every other day. They appeared to be on amicable terms. She expressed a wish that the articles had not been drawn and were destroyed.

They did not cohabit together to his knowledge. On a cross-examination, he says he was at home at the time of that visit about three days.

Mrs. Smith fixes the visit of Mrs. Heyer at her house to have lasted three or four days ; and Heyer was at the house every day. They were on good terms. They were often alone, but did not cohabit.

Margaret Heyer speaks of the same visit, and that they appeared on good terms. She says Heyer shortly after went to sea. William Coger makes a similar statement.

Agnes Hammond swears that Mrs. Heyer told her she never intended that the articles should be put in force ; that she could not live without him. She fixes an interview in which such expressions were used, as being in the cholera season of 1832, and about a month before she heard of Mrs. Heyer's death.

I pass over the inconsistent statements made by her upon the cross-examination, because, as to the fact of a declaration of Mrs. Heyer that the articles should not be acted upon, she is corroborated by Sarah Weed, who states that Mrs. Heyer said no one should use the articles; she had destroyed them, or intended to destroy them, or words to that effect.

The whole of this testimony shows merely a casual intercourse upon a friendly footing for three or four days, and loose expressions relative to an intention to destroy the articles, and the expression of a wish that they had not been made. I cannot consider this sufficient to prove a permanent reconciliation ; an agreement again to live and cohabit together. They indicate a temporary change of feeling, and no more. Heyer remained here for the residue of the month of July, and they do not appear to have met again.

There is also an averment in the answer, which, if responsive to the bill, is decisive upon the question of Mrs. Heyer's intention to abrogate the articles. After stating the actual delivery of the instrument, and that it was given to Mrs. Heyer for the purpose of showing to counsel, it is averred that the said articles were permitted

to remain in her possession until the day previous to her death, when the trustee being at the house of Christopher, where Sarah resided, she told him that the articles were in a drawer, to which she pointed, and that he must take charge of them; and in which drawer they were found after her death.

Upon examining the allegations of the bill as to the want of delivery, and that the paper continued in the possession of Mrs. Heyer until her death, and as to the discovery of it by the executors among her private papers after her death, I consider the answer in this respect responsive; and then the conclusion is, that Mrs. Heyer meant to keep them in force.

I find no authority in which an agreement for separation has been considered as waived upon evidence of reconciliation so slight as is found in this case. In *Fletcher* v. *Fletcher*, (2 *Cox's Ca.* 104,) after the articles of separation had been signed, the parties were immediately reconciled; went home together with great cordiality, and lived together in harmony for seventeen days. Letters were written by the wife, and declarations were in evidence plainly showing that the reconciliation was real, and the reunion meant to be permanent. And the court (Justice Buller) also concluded that the interposition of others, and not the wishes or change of sentiment of the wife, produced the subsequent alienation.

In *Bateman* v. *Ross*, (1 *Dow's Rep.* 233,) Lord Eldon said, that notwithstanding what might be found in some of the reports, the general doctrine was clear, that a reconciliation after a separation did away with the effects of it. This rested upon the ground of public policy, as it must not be permitted to parties to make agreements for themselves, to hold good whenever they chose to live separate. Upon the evidence, however, there was no reconciliation. In *Westmeath* v. *Salisbury*, (5 *Bligh's Rep.* 339,) the subject is very fully discussed. It is sufficient to say, that after the deed of August, 1818, (dated in May,) no separation took place, but the parties lived together, to all appearance to the world, as if no separation had been agreed

1839.

Heyer
v.
Burger et al.

upon; and there was some testimony indicating co-habitation.

Again—whatever just criticism may be made upon the case of *Whorewood* v. *Whorewood*, (1 *Ch: Ca.* 250,) as a case of jurisdiction, its principle will be found correct. The decree for alimony was not set aside upon a proffer of support and cohabitation, but only suspended, that a trial might be made between the parties—the court say-ing, they could again lay it on if the case required it.

II. Assuming the articles of separation to have been originally valid, and never to have been cancelled, and to have conferred the power to make a will, the next question discussed at the bar was, as to the capacity of the testatrix; the complainant averring that the will is void from her incompetency, and from imposition practised upon her, and that it was not duly executed.

By the agreement between the parties, a house and lot on Staten Island, as well as personal property, was con-veyed to the trustee. The will disposes of real estate as well as personal. No question can, however, arise as to the realty, because the complainant could only be entitled to rents in arrear at the death of his wife, (there being no child of the marriage,) and the bill does not state that there were such arrears. The difficulty, therefore, where the will is both of real and personal estate, does not occur upon this record. (*Bogardus* v. *Clark*, 1 *Ed. Rep.* 266.)

But here a point arises not adverted to by counsel.

It is settled that this court has no orginal jurisdiction to try the validity of wills of personal estate. (*Colton* v. *Ross*, 2 *Paige*, 398. *Clarke* v. *Fisher*, 1 *Paige*, 176, and the cases cited. Also, *Kerrick* v. *Bransly*, 7 *Br. P. C.* 437. *Den* v. *Ayres*, 1 *Green*, 155.)

The decisions in our own courts upon this point within my knowledge, were upon wills dated and proved before the Revised Statutes went into effect. Such were the cases of *Colton* v. *Ross* and *Clarke* v. *Fisher*, and, as I presume from the date, of *Townsend* v. *Sice*, (March, 1830,) referred to by Chancellor Walworth.

The statute is now to determine the rule. The act

1839.

Heyer
v.
Burger *et al.*

of 1813 gave to the surrogates sole and exclusive power to take proof of last wills and testaments. (1 *R. S.* 445, § 3.) The 23d section of the Revised Statutes, (Vol. ii. p. 60,) is substantially the same; and by the 29th section, the probate of any will of personal property taken by a surrogate having jurisdiction, shall be conclusive evidence of the validity of such will, until such probate be reversed on appeal, or revoked by the surrogate, as afterwards directed, *or the will be declared void by a competent tribunal.*

The revisers state that this section is declaratory of the existing law, citing 1 *Phillips' Ex.* p. 245. The authorities there collected are to the point, that in a court of common law, the probate before the ecclesiastical jurisdiction is conclusive.

The statute proceeds to give the power to the surrogate to revoke the probate upon the application of any of the next of kin within a year. (2 *R. S.* § 30.) It gives the same right of appeal from a decision pronounced upon such an application, as in other cases. (2 *R. S.* 62, § 38.) And an appeal from the decision of a surrogate admitting a will to probate or rejecting it, whether such will is of real or personal estate, or both, is given to the circuit judge of the circuit. (2 *R. S.* 66, § 55.)

If upon such appeal an issue is granted, the final determination is conclusive as to wills of personal estate only upon the parties to the proceedings ; (2 *R. S.* 67, § 59 ;) and by a preceding section, although after a will of real estate has been admitted to proof, the record or exemplification is to be admitted as evidence, it is only in like manner as the original will would be, and may be repelled by contrary proof. (2 *R. S.* 58, § 15.)

From an examination of these various provisions, I am unable to fix any meaning to the clause used in the 29th section of the statute, viz: "or the will be declared void by a competent tribunal," unless it refers to cases in which executors or trustees come to establish a will, or carry it into execution, and its validity is contested.

I cannot however suppose that the legislature meant by such a clause to *confer* jurisdiction upon the court. It

1839.

Heyer
v.
Burger et al.

alludes to a tribunal competent by law, and to a tribunal thus competent at the passage of the act, or subsequently rendered so by law. The court of chancery had at that time no authority to set aside a will of personal estate, and has not since acquired the power.

If this view is correct, then the jurisdiction is in effect prohibited by statute.

Another question should, however, be adverted to. Whether the remedy in the surrogate's court was open to the complainant, or whether any circumstances existed precluding him from it.

There can be no doubt that the complainant could have filed a *caveat* against the granting of letters testamentary to the executors, or could have applied for letters of administration to himself. In either way, all the questions as to the validity of the will could have been raised and determined. It may be, that in strictness a husband is not entitled to a citation to attend the proving of a will, nor entitled to contest it within a year, by filing allegations under the 30th section of the act. (2 *R. S.* 61.) These provisions relate only to the next of kin, and a husband is in no respect such. (*Watt* v. *Watt*, 3 *Vesey*, 246.) But the right to have entered a caveat is unquestionable. The case of *Moss* v. *Brander*, (1 *Phillimore*, 254,) is decisive upon this point.

That case bears in several particulars so much upon the present, that it may be useful to state its leading points.

A will of a married woman had been propounded for proof, and the husband entered a caveat against it. The objection taken by him was, that the will was not a due execution of a power given to his wife to make a will. He afterwards set up another will in his own favor, but not at the time of entering the *caveat*, nor until a year after ; and in a bill filed by him to get possession of leases, stating he was taking steps to get administration, he alleged that his wife died intestate. He afterwards produced a will to himself, and obtained letters, with the paper annexed.

It was held that the first will of the wife was well exe-

cuted, under a power given to her by a bond, and that the husband, upon the evidence, had failed to prove a subsequent valid will.

The complainant in this cause appears to have been in the country in November or December, 1832. At that time his demand upon the executors was served. The will was admitted to probate on the 8th of October, 1832. I do not find in the testimony, whether the complainant was here at the time of the probate or not. He sailed from New-York the 3d of August, 1832. If here before the probate, his remedy was clear. If not here, either he is within the equity of the 30th section of the statute, and thus bound to contest the will within a year, or, if that does not apply, he could contest it at any time within which, by the general ecclesiastical jurisdiction, such contest is permitted. In *Satterthwaite* v. *Satterthwaite*, (3 *Phill.* 1,) the probate of an imperfect codicil was revoked after the lapse of nine years. In another case, Sir John Nicholl said that time alone formed no absolute bar. (*Finnane* v. *Gaerce*, 3 *Phill.* 405.)

Whether there is any redress, or any in this court, in a case of absence from this state beyond the year, is not for me now to determine. In the late case of *Gingell* v. *Horne*, before the vice-chancellor of England, (Feb. 12, 1839, *Monthly Law Magazine for May*, 1839,) a bill was filed for the purpose of setting aside a will and codicil, of which the ecclesiastical court had granted probate, upon the ground that it was fraudulently obtained, but that the circumstances were not known till after the term expired within which an appeal might have been made from the decree. A demurrer to the bill was allowed on the ground of want of jurisdiction. By reference to the case of *Lewis* v. *Owen*, (1 *Lee's Rep.* 538,) it appears, that where a sentence was pronounced on the 6th of March, 1750, and an appeal was not lodged until after the 17th of August, 1751, it was dismissed, as not having been interposed within the time allowed by law. And the court in South Carolina has entertained a bill, and given relief in such a case of absence as is suggested.

A decree was made compelling the executors, to whom probate was granted, to consent that it be opened for the purpose of letting in the party to a fair contest of the will. (*McDowal* v. *Peyton*, 2 *Dess.* 313.)

The right to the personal estate of the wife vests in the husband *jure mariti*, and does not depend upon his obtaining letters of administration. Although he cannot sustain an action for her property without such letters, yet the course of succession is changed without them, so that his representative becomes entitled, not the representative of the wife. (*Watt* v. *Watt*, 3 *Vesey*, 246. *Bourne* v. *Crofton*, 2 *Molloy*, 318. *Elliot* v. *Collier*, 3 *Atk.* 526.)

In the last cited case Lord Hardwicke held, that though the ecclesiastical courts were bound to grant administration to the next of kin of the wife, yet that did not bind the right in this court, for the husband surviving the wife, the whole estate vested in him at the time of her death ; and there were several cases in which it had been held that the administrators were mere trustees.

And this principle is expressly recognized in the Revised Statutes. Where letters of administration are granted to any other person than the husband, he shall pay over the assets remaining after the discharge of debts to the husband, or his personal representatives. (2 *R. S.* 75, § 30.)

It at first struck me that an argument for the jurisdiction might be founded upon this provision. But the case of an administration is very different from that of letters testamentary upon a will. The former constitutes a trustee for whoever shall appear by law entitled ; the latter for those provided for in the will, and as in this case, in hostility to the claims of the husband.

My conclusion is, that the complainant could have had in the surrogate's court a relief clear, certain and ample ; that no circumstances impeded it ; that in such a case the jurisdiction is vested there exclusively, and necessarily prohibited here ; and hence, that had such objection been taken to this bill by demurrer, by answer, or at the hearing, it must have prevailed.

But it has never been taken by the defendant in any form ; and the question then remains, whether the court is called upon to raise it.

The time and mode of taking an objection to jurisdiction is a question of importance. It is settled in our court, that where there is a full and adequate remedy at law, the objection must be taken in a pleading. It is too late to raise it at the hearing. ( *Grandin* v .*Le Roy*, 2 *Paige*, 509, and the cases cited.) But the chancellor in the case cited, as well as in *Hawley* v. *Cramer* referred to, (4 *Cowen*, 727,) adds the qualification, " unless this court be wholly incompetent to grant the relief sought by the bill." This doctrine is repeated by him in *Wiswall* v. *Hall*,(3 *Paige*, 316,) and more deliberately in *The Bank of Utica* v. *The City of Utica*, (4 *Paige*, 400,) where there was a written stipulation to submit the case upon the bill alone, and he held this to be a waiver of the objection. (See also *Underhill* v. *Van Cortlandt*, 2 *Johns. Ch. Rep.*) In Ireland, Lord Manners has admitted the objection of a full remedy at law to be raised at the hearing. (*King* v. *Barrett*, 2 *Molloy*, 319.)

Where the objection is on the ground of a jurisdiction possessed by another equity tribunal, some distinctions exist. If the subject matter is of general equity jurisdiction, but owing to the locality of the subject of the suit it belongs to another court, the general rule is, that the objection must be taken before entering upon the defence at large. A plea for matters local, as for lands situate within the county palatine of Cheshire, is good; but not a plea where the matter of the bill is personal estate. (*Edgeworth* v. *Davies*, 1 *Ch. Ca.* 40.) So a plea that a defendant was a scholar of Oxford, which had a court of equity of its own, was sustained. (*Cary's Rep.* 92. *Anon.* 19 *Eliz. Ibid* 94.) The lord keeper in *Pratt* v. *Taylor*, (1 *Ch. Ca.* 237,) appears to question the case in *Cary*, but whether only on the point of form, it being a certificate and not a plea, or on a general ground, is doubtful. (See *Stephens* v. *Dr. Barry*, 1 *Vernon*, 212.)

In *Strode* v. *Little*, (1 *Vernon*, 58,) there was a de-

murrer and plea to a bill for an account of profits of certain mines, stating that jurisdiction was given to certain courts by act of parliament; and it was said it was like the jurisdiction of the sewers, with which this court could not meddle. The lord chancellor held the plea bad, because there was no averment of there being any court of equity in that jurisdiction. It was stated that the jurisdiction by the act had been transferred to certain ancient courts, in respect to which this court did not interpose.

In *Trelawney* v. *Williams*, (2 *Vernon*, 483,) upon a question as to the jurisdiction of a stanary court, the lord keeper said that was a court of law only, not of equity as well as law, and yet even there to oust this court, the defendant must plead to the jurisdiction.

Lord Hardwicke, in *Penn* v. *Lord Baltimore*, (1 *Vesey*, 446,) qualified this rule. He says: " To be sure a plea of the jurisdiction must be offered in the first instance, and put in *primo die;* and answering submits to the jurisdiction ; much more when there is a proceeding to hearing on the merits which would be conclusive at common law; yet a court of equity, if a plain defect of jurisdiction appears at the hearing, will no more make a decree, than where a plain want of equity appears."

Lord Redesdale, (p. 153,) after commenting upon the jurisdiction of the inferior equity courts of England, says : "But where no circumstance can give the court jurisdiction, as in the case alluded to of a bill of appeal and review of a decree in a county palatine, it will not entertain the suit, even though the defendant does not object to its deciding on the subject." He refers to the case of *Jennett* v. *Bishop*, (1 *Vernon*, 184.) The statement of that case will illustrate the point now discussed.

In a previous case, (*Partington* v. *Tarbock*, 1 *Vernon*, 178,) upon a plea of the jurisdiction of the court of exchequer in the county palatine of Chester, to a bill of review and appeal, the lord keeper was inclined to overrule the plea; but it stood over, and was allowed after the argument had been made in *Jennett* v. *Bishop*. (See 1 *Vernon*, 184.)

In *Jennet* v. *Bishop*, in the same year, the same ques-

tion came up upon demurrer, and after long debate, the
lord keeper allowed it, holding an appeal would not lie.

It appears that an appeal is given from a court of equity
at Lancaster, to the Dutchy Court, by act of parliament.
(*Addison* v. *Hindmarsh*, 1 *Vernon*, 442. See 5 *Vesey*,
725.) Lord Redesdale speaks of *Jennet* v. *Bishop*, as de-
pending in the county palatine of Lancaster, when in fact
it was in Chester. But he speaks of these courts, viz.
Chester, Lancâshire and Durham, as having their own
peculiar courts of appeal ; and there is therefore just
ground to presume that there was an act of parliament
constituting an appeal court for Chester as well as Lan-
caster.

It has also been held, that the objection to the jurisdic-
tion of the court, from the small value of the thing in ques-
tion, may be taken at the hearing. (*Fullerton* v. *Jackson*,
5 *Johns. C. R.* 276. *Brace* v. *Taylor*, 2 *Atk.* 253.) At
present this is a statutory regulation in our state, and the
objection may of course be raised at any time. (*Smets* v.
*Williams*, 4 *Paige*, 364.) There is no express decision
that it may not be waived by submission.

Under the judiciary system of the United States, the
circuit courts have jurisdiction only in suits between citi-
zens of different states or foreigners. The jurisdiction
must appear upon the record, and the objection for a defect
of this kind may be taken even upon appeal in the supreme
court. (*Story's Equity Pleading*, p. 383. *Bingham* v.
*Cabot*, 3 *Dallas*, 382, and note.) I do not find in these
cases a decision that the objection cannot be waived. (See
*Brown* v. *Reeve*, 8 *Peters*, 112.)

The direct authority which I have discovered, is there-
fore very slight ; but, upon principle, I am of opinion,
that where a statute prohibits jurisdiction, or where a pro-
hibition is necessarily implied by its being vested exclu-
sively in another tribunal, no consent, express or implied,
can give jurisdiction. The maxim *volenti non fit injuria*
must not be applied, where public policy is invaded by
the assumption of jurisdiction ; and public policy *is* inva-

ded where a tribunal listens, even with consent of parties, to a cause, the determination of which has been consigned to another forum.

My opinion therefore is, that the court should in this case take the objection.

But as I have found no direct authority, except the passage from Lord Redesdale's Treatise, and as this part of the case has been fully argued upon other points, I deem it right to express my views as to these.

The objection that the will does not refer to the power is untenable. (*Bradish* v. *Gibbs*, 3 *Johns. C. R.* 551.)

As to the capacity of Mrs. Heyer to make a will, I am satisfied that, down to the time of her affixing her mark to the instrument, she was fully competent.

Doctor Smith saw her until 8 or 9 o'clock on the morning of her death, and considered her at the latest hour in a condition to make a will. Charles Waller, a subscribing witness, was present when the will was read. After this was done, she was asked if it was to her wishes, and she replied "yes" in a very languid tone. She was requested to sign it, but said she would rather wait, as her hand was weak and trembling ; that her hand-writing would not look well. "I am in the habit of writing a good hand." She said no more after that. When again requested after a few minutes to sign it, she stretched forth her hand ; the top of the pen was put in it, and she held it while Wilson made a mark for her. The testimony of this witness is clear as to her self-possession, and her having full understanding of what she was about. It appears also to be delivered with caution and precision.

Strengthened as this testimony is by that of Wandell, Mrs. Braisted, and Mrs. Sylvia, it leaves no doubt on my mind as to her capacity.

But Wilson positively swears that the mark was made by the action of his hand ; that she was so far gone that she could not make the mark herself ; and that after making the mark she did not speak a word, and had lost the power of articulation completely.

In the fact that the testatrix never spoke after making her mark, Wilson is corroborated by Waller. The latter fixes the last words she uttered as being two or three minutes before she made the mark; and though he saw her lips move after that act, he thought she was uttering a prayer from the expression of her eye and countenance.

It is true Mrs. Sylvia says, that after the will was signed it was read to her by Wilson, who asked her if that was her last will; that she bowed her head. After she had made her mark she said nothing more about the will. After it was read to her, she said "it was all right." As to this last expression I think the witness refers to the declaration before signing. It is remarkable that so important a fact as the reading of the will after signature is not stated by Wilson, Wandell, or Waller. Mrs. Sylvia also says, that Wilson wrote the will in the room, on the stand. I understand him to state otherwise. I am inclined to think Mrs. Sylvia is mistaken as to the period of reading the will.

These facts raise an important question as to the publication of this will.

By the Revised Statutes, (vol. ii. p. 63, § 40,) the testatrix, at the time of making the subscription, or at the time of acknowledging it, shall declare the instrument so subscribed to be his last will and testament. This therefore is a statutory declaration upon a point not settled, I believe, by decisions of our own courts.

In the case of the will of Mr. Windham, cited by Lord Hardwicke, (3 *Atk.* 161,) it was held at the bar of the king's bench, that a publication was requisite, although the execution in the presence of three witnesses, and their attesting it in presence of the testator was undisputed; and he concluded that publication was in the eye of the law an essential part of the execution.

Mr. Roberts cites several cases of a different import, (on *Wills*, p. 120,) and deduces from them the position that an acknowledgment of the signing is a sufficient publication.

Mr. Powell (on *Devises*, p. 90, *Jarman's* ed.) collects the authorities, and says, that a publication may be inferred from circumstances, and will have the same force to render the instrument valid as if expressed by parol declaration.

1839.

Heyer
v.
Burger et al.

In *Meadie* v. *Reid*, (7 *Taunton*, 355,) C. J. Gibbs said, "that neither the statute of Henry VIII. nor that of Charles II. speak of publication. A will as such does not require publication, be it what it may. That he did not know what the publication of a will was. He could only suppose it to be that by which a person designates, that he means to give effect to a paper as his will."

In *White* v. *British*, (6 *Bingham*, 310,) the chief justice, after detailing various circumstances attending the execution of the will, says, "We therefore think the testator did acknowledge in fact, though not in words, that the will was his." (See also *Ray* v. *Walton*, 2 *Marshall*, 74. *Small* v. *Small*, 4 *Greenleaf*, 220.)

These authorities, if the statute of 1813 had remained unchanged, would have dissipated all doubt, and subscription and due attestation would have been publication.

But the provision of the statute before cited, plainly requires an act distinct from subscription or acknowledgment of subscription; distinct from attestation; an independent act. The term "shall declare" is made use of, intended, no doubt, as synonymous with, and the substitute for "publish." And the provision seems also clearly to require that the declaration must follow the subscription.

In my opinion the will, on this ground, was void.

But the invalidity of the will is not sufficient to enable the complainant to recover, unless the articles of separation are also invalid; because it is provided by them, that in default of said Sarah making a will, the property is to go *to her lawful heirs.*

As I have already expressed an opinion that these articles are in force, the complainant can have no relief.

The bill must be dismissed with costs.