In re HOCK'S WILL.

(Surrogate's Court, New York County. April 24, 1911.)

1. WILLS (§ 303*)—PROBATE—EVIDENCE—SUFFICIENCY—TESTIMONY OF ATTESTING WITNESSES.

The evidence of subscribing witnesses to a will, although strangers to the testator, is sufficient, standing alone, to establish the execution of a will.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 711–723; Dec. Dig. § 303.*]

2. WILLS (§§ 55, 166*)—PROBATE—CAPACITY—UNDUE INFLUENCE—EVIDENCE.

The proofs which authorize a denial of probate to a duly executed will, contested on the ground of incapacity and undue influence, should be irresistible; and whenever their effect is doubtful in law, or when the proofs are unrelated to the precise allegations stated in the objections to probate, the presumption should be for the will, if the factum of the will is otherwise established.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 138, 421; Dec. Dig. §§ 55, 166.*]

3. WILLS (§§ 53, 164*)—CAPACITY—UNDUE INFLUENCE—EVIDENCE—RELATIONS OF TESTATOR TO PERSONS BENEFITED OR EXCLUDED.

Where there is an issue, on the propounding of a will, as to testator's want of capacity or undue influence, his relation to those benefited or excluded under his will, whether they were of his household or objects of his solicitude or interest, is admissible as tending to show that the papers propounded as a will are in accordance with the testator's pronounced intent.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 129, 406; Dec. Dig. §§ 53, 164.*]

4. WILLS (§ 41*)—TESTAMENTARY CAPACITY—EVIDENCE.

Where the contestants of a will allege testamentary incapacity, and give evidence of testator's mental peculiarities, without proof of his normal condition and conduct, and show occasional instances of eccentricity at times other than at the execution of the will, without precise proof of testator's ordinary habits of mind and body, such facts are without bearing on the testator's mental condition at the execution of his will; the material point being the departure from testator's normal condition.

[Ed. Note.—For other cases, see Wills, Cent. Dig. § 84; Dec. Dig. § 41.*]

5. COURTS (§ 98*)—RULES OF DECISION—PROBATE COURTS OF OTHER COUNTRIES.

Since probate courts in different countries are similar in their origin and their jurisdiction, the foreign judgments of courts of probate are cogent as precedents in testamentary causes in this country.

[Ed. Note.—For other cases, see Courts, Dec. Dig. § 98.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

6. WILLS (§ 38*)—TESTAMENTARY CAPACITY—INSANITY—INFLUENCE ON WILL.

It is not enough to establish occasional delusions of the testator; but they must in some way influence and enter into the will itself, and the will complained of must be the actual offspring of the delusion, to affect the validity of the will.

[Ed. Note.—For other cases, see Wills, Cent. Dig. § 79; Dec. Dig. § 38.*]

7. WITNESSES (§ 255*) — REFRESHING RECOLLECTION — OFFICIAL RECORDS — MEMORANDA.

Where the records of a hospital are shown to be true at the time when made, and that the physician who made them has no independent memory of the facts, they may be used by such physician to refresh his recollection.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 874–890; Dec. Dig. § 255.*]

8. EVIDENCE (§ 351*)—DOCUMENTARY EVIDENCE—OFFICIAL OR PUBLIC DOCUMENTS—HOSPITAL RECORDS.

The records of a hospital are not public documents, receivable as evidence of the facts stated therein.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 1388–1397; Dec. Dig. § 351.*]

9. EVIDENCE (§ 558*)—OPINION EVIDENCE—CROSS-EXAMINATION OF EXPERTS —REFERENCE TO AUTHORITIES.

An expert medical witness, called by the contestants to a will, may be asked, on cross-examination by counsel for the proponents, whether medical books of authority from which counsel reads did not express opinions different from those testified to by the witness, the reference not being for the purpose of making the statements of such books evidence, but solely for the purpose of ascertaining or testing the weight to be given to the witness; and, in the discretion of the court, the answers agreeing with the authorities may be stricken out, and those disagreeing with them allowed to stand.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 2377; Dec. Dig. § 558.*]

10. EVIDENCE (§ 556*)—OPINION EVIDENCE—EXAMINATION OF EXPERTS—REFERENCE TO AUTHORITIES.

A party calling an expert medical witness cannot read from medical works on inductive science, and ask his witness if he agrees with the statement of the authority, or if it accords with his experience.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 2377; Dec. Dig. § 556.*]

11. WILLS (§ 322*)—PROBATE—CITATION OF PROBATE COURT—"SURROGATE'S WITNESSES"—WAIVER OF CITATION.

History of "probate in common form" and "in solemn form," by the interposition of a caveat, and the jurisdiction of the courts of probate and of the Surrogate's Court reviewed; and under Laws 1837, c. 460, § 11, providing for the examination of "attesting witnesses," increased in scope by Laws 1841, c. 129, so as to apply "to all witnesses whom any person interested in the proof of a will shall request to be examined," afterwards incorporated with Code Civ. Proc. § 2618, by which a notice is filed and an order procured for the examination before the surrogate of the witnesses named in the notice, called "surrogate's witnesses," *held*, that parties may waive, either actually or constructively, the necessity of calling any "surrogate's witnesses" not essential to prove the factum of the will.

[Ed. Note.—For other cases, see Wills, Dec. Dig. § 322.*]

12. WILLS (§ 300*)—PROBATE—WITNESSES—CREDIBILITY AND IMPEACHMENT— RIGHT TO IMPEACH.

Under Code Civ. Proc. § 2618, providing for the filing of notice to and an order for the examination of all witnesses whom any person inter-

ested in the proof of a will shall request to be examined, and in which it is the practice of contesting parties to place the names of all their witnesses, called "surrogate's witnesses," contestants of a will, who so place the names of witnesses in a notice and order, and who call such witnesses to the stand, are bound by the evidence of such witnesses, other than attesting witnesses, except in cases of surprise.

[Ed. Note.—For other cases, see Wills, Dec. Dig. § 300.*]

13. WILLS (§ 303*)—CREDIBILITY—RIGHT TO IMPEACH OWN WITNESSES—ATTESTING WITNESSES TO WILL.

The proponents of a will, who are obliged to call the subscribing or attesting witnesses, should not be bound by their testimony, when against the will; for they may be able to prove the will over the contrary evidence of the attesting witnesses.

[Ed. Note.—For other cases, see Wills, Cent. Dig. § 723; Dec. Dig. § 303.*]

14. WILLS (§ 231*)—PROBATE—NATURE AND PURPOSE OF PROBATE—PROCEEDING IN REM.

The probate of a will is a proceeding in rem.

[Ed. Note.—For other cases, see Wills, Cent. Dig. § 560; Dec. Dig. § 231.*]

15. WILLS (§ 312*)—PROBATE—HEARING OR TRIAL.

A contested probate is a trial of an issue of fact, and subject to the same rules as other trials; and all the rights and privileges of parties on a trial of other issues of fact should be accorded to parties to a contested probate.

[Ed. Note.—For other cases, see Wills, Cent. Dig. § 739; Dec. Dig. § 312.*]

16. WILLS (§ 55*)—TESTAMENTARY CAPACITY—EVIDENCE—WEIGHT AND SUFFICIENCY—INSANITY—MENTAL CONDITION.

Evidence in a will contest *held* insufficient to show that the testator was mentally incompetent at the time of the execution of his will.

[Ed. Note.—For other cases, see Wills, Dec. Dig. § 55.*]

17. PLEADING (§ 21*)—ACTION TO CONTEST WILL—INCONSISTENT ALLEGATIONS.

An allegation of undue influence, made in a contest of a will, is inconsistent with an allegation of insanity, since an insane person, or one non compos mentis, may not in law be influenced.

[Ed. Note.—For other cases, see Pleading, Cent. Dig. § 44; Dec. Dig. § 21.*]

18. WILLS (§ 166*)—VALIDITY—UNDUE INFLUENCE—WEIGHT AND SUFFICIENCY OF EVIDENCE.

Evidence in a will contest *held* insufficient to show that a will propounded for probate was executed under undue influence.

[Ed. Note.—For other cases, see Wills, Dec. Dig. § 166.*]

In the matter of the contested will of John Hock. Decree for probate of the papers propounded as the will, and a codicil thereto, of John Hock.

Jacob Walz (Grant Hoerner, of counsel), for proponent.
Gilbert H. Montague, for contestant.
H. W. Richardson, for Julia Hock.
E. J. Tinsdale, special guardian, for Mary Hock.
George W. Olvany, special guardian, for Frank Hock.

FOWLER, S. The papers propounded in this cause as the will, and a codicil thereto, of John Hock, were executed on the 27th day of April, 1910, in the city of New York, in the house where John Hock then lived. The will and codicil were attested by the lawyer who drafted them and by two other attesting witnesses, both strangers to John Hock before the attestation in question. The formal

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

execution of the papers propounded corresponds in detail with the requirements of the statute of wills.

[1] The evidence of the subscribing witnesses, although they were strangers to the testator, is sufficient, standing alone, to establish the execution of the will and codicil. Marx v. McGlynn, 88 N. Y. 357. The surrogate saw these witnesses, and they seemed to be intelligent and truthful. They had no sinister object to subserve in acting as attesting witnesses to the papers in question.

The objections to the probate in this proceeding are taken by Bessie Hock and Frank Hock, the grandchildren of the testator. They are the children of a deceased son. Apparently their mother, testator's daughter-in-law, has also filed objections to the will and codicil; she having been cited to attend the probate.

The will in controversy leaves the testator's estate to his only surviving son, Jacob, and it nominates Jacob sole executor. The codicil, bearing date on the same day as the will, bequeaths $100 to each of his daughters-in-law, and to his grandchildren, Bessie and Frank Hock, $50 and $100, respectively; otherwise, it confirms and ratifies the will. The attesting witnesses to both instruments propounded are the same persons.

Just prior to the execution of the papers propounded, John Hock appears to have placed all of his personal property in this jurisdiction, consisting of money in savings banks, in the names of his son Jacob and himself, to be held for their joint account. If such transfers were complete to carry title to Jacob, which I doubt (Matter of Bohn, 136 N. Y. 177, 32 N. E. 626; Estate of Lætitia M. Myers, 129 N. Y. Supp. 194, opinion of Surrogate Cohalan)—and their validity is not involved in this proceeding—it would seem as if there were no personal property of testator which will pass under the will and codicil in controversy. Substantially all the residue of John Hock's estate consists of a house and lot in the state of New Jersey. It is of no great value. Neither the will nor the codicil contains a power of sale to the executors. Notwithstanding this situation of the estate, testimony taken on the hearing in this matter consumed some sessions of the court; all the parties to the cause insisting that the probate proceeding was a matter of right and the surrogate's jurisdiction complete. The surrogate has proceeded on this assumption (Matter of Davis, 182 N. Y. 468, 75 N. E. 530), despite the proofs of the situation of the estate given in evidence.

[2] The objections to probate are founded on the common allegations of intestability and undue influence, and the proofs given in on these points by both proponents and contestants are most voluminous. Contested wills have become so common as to greatly resemble the former courts of probate in solemn form, where the proponents were compelled by a caveat to give evidence in detail and under oath of all matters relating to the factum of will. The evidence of the contestants is, under the present practice, oftentimes so insufficient as to relieve the proponents of the necessity of giving what Surrogate Bradford accurately terms "adminicular proofs" to support the probate. This case is hardly such an instance as that suggested as too common practice; but in this cause it seems to the surrogate that contestants'

proofs fall far short of those which justly authorize the surrogate to disturb the will of the dead. Such proofs ought to be irresistible. Whenever their effect is doubtful in law, or when the proofs are unrelated to the precise allegations stated in the objections to probate, the presumption should be for the will, if the factum of will is otherwise established.

[3] In this cause John Hock, the alleged testator, appears from the testimony to have been an illiterate man, following very respectably throughout his life the vocation of a peddler, in which he accumulated some little estate. For some time before the execution of the papers propounded, Jacob Hock, the only surviving son of the testator, lived with John Hock in the same house, or in the same household. Jacob's young children throughout this period seem to have been the chief objects of the testator's constant solicitude. As they were deprived of the care of their mother by reason of a mental malady which confined her to a distant place, the grandfather, John Hock, seems to have stood to Jacob's children in loco parentis. Such care as he could give them John Hock intelligently gave. His anxiety for their superior education was exemplified by testimony showing his interest to the last of his life in securing for these children a good school, and it is very significant of testator's real interest in life. In fact, his son Jacob and Jacob's children were the closest companions of the testator's life. They constituted his family as none else did. The children of his deceased son and their mother, however friendly their relations with John Hock, were not of his immediate household at the time the will was made. They were not the companions of his daily existence, or equally the objects of the testator's solicitude or interest in his lifetime. This is reasonably clear from the proofs bearing on the testator's circumstances and family relations. It is by such proofs as these that the surrogate is enabled to ascertain whether or not papers propounded as wills are in accord with testator's pronounced intentions in causes where undue influence or want of capacity are charged by contestants.

In this particular cause intestability and undue influence, although inconsistent allegations, are both charged by contestants. While the testator had an undoubted right to do what he pleased with his own, if want of testamentary capacity or moral coercion, amounting in law to undue influence, is here established by contestants, the papers propounded as John Hock's will are not entitled to probate.

[4] Concerning the allegation of want of testamentary capacity, it appears that John Hock was about 68 years of age when the papers propounded were executed. He seems to have been of average intelligence through life, but in waning health which he affixed his signature to the will and codicil. His ability to sign his name was the extent of his literary accomplishments, as he could neither read nor otherwise write. Much testimony was given by contestants bearing on the mental peculiarities of testator, but no evidence appears as to testator's normal conduct in life, so that the surrogate is unable to determine that such peculiarities are in his case abnormal or even evidential of mental disorder. A brusque, rough manner, which is natural to one person, indicates nothing but mental health to him; whereas,

such roughness in a person habitually gentle and refined may have a totally different significance. It is not the abstract act or feeling which constitutes a symptom. It is the departure from the normal. Without proof of the normal condition of testator, how is the surrogate to determine whether the eccentricities of a testator are normal or abnormal? In this cause unrelated instances of eccentricity have no legal sequence, without proof of the normal manners, habits, and conduct of John Hock throughout his hard-working life. Mudway v. Croft, 2 Notes of Cases in Ecc. Courts, 438. In the foreign case just cited the conclusions concerning the legal effect of eccentric conduct as bearing on testability are worked out with precision and thoroughness, and the conclusions in question commend themselves to my judgment.

[5] Probate courts are alike the world over. Their probate jurisdiction, unlike the civil jurisdictions of other tribunals, has usually a common origin and early history, and the exercise of all probate jurisdictions operates on like conditions and under like circumstances. Thus the foreign judgments of probate courts have a cogency in testamentary causes in this country which other foreign judgments do not have on other domestic courts. Surrogate Bradford, facile princeps of the probate officers of this country, and the Court of Appeals of this state, have frequently resorted in testamentary causes to other probate jurisdictions for light and illustration. Such high precedents seem to me to be founded in good reason. The opinion of Sir H. Jenner Fust in Mudway v. Croft is such a one as deserves attention in any testamentary cause involving proofs of eccentricity and their legal effect. The opinions of this learned judge are frequently cited by both Surrogate Bradford and the Court of Appeals of this state.

It is certainly impossible to compare the eccentricities of John Hock with those of the average man; for no such man exists, except in imagination. Without precise proofs of John Hock's ordinary habit of mind and body, it is impossible for the surrogate to say whether unrelated instances of eccentricity in his case have or have not a bearing on John Hock's mental condition on the day the testamentary papers were executed. The surrogate cannot, therefore, attach much importance to this branch of the contestants' proofs in this cause. They are too unrelated.

[6] There was also evidence given in this matter of some possible delusions on the part of John Hock, not at the precise moment of testamentation, but at a time when John Hock was undoubtedly managing his ordinary affairs, looking after Jacob's children, and able to take care of himself. If we assume that the testimony bearing on the alleged delusions of John Hock establishes such delusions, and on that point there is grave doubt, as the testimony is not very clear, what is the effect of such delusions on the mental capacity of John Hock at the moment of testamentation? It is not enough to establish occasional delusions of a testator. They must in some way enter into the will itself in order to have legal consequences. The will complained of must be the actual offspring of the delusion; otherwise the two things stand unconnected. It is not apparent, if we assume that John Hock had several delusions as to matters not connected with his will, that the contestants have in any way established in this cause that the

will was their offspring. In so far as such delusions show general weakened mentality, they may have some indirect consequence in view of subsequent events, but in that connection only.

We now come to the serious point in this cause. The will and testament propounded were executed by John Hock on the 27th day of April, 1910. On the 8th day of May, 1910, John Hock, the testator, was taken away from his home to Bellevue Hospital, and upon the 9th day of May, 1910, he was adjudged insane, and committed by a justice of the Supreme Court to the Manhattan State Hospital, Ward's Island, where he was taken on May 11, 1910. On June 2, 1910, John Hock died. Thirteen and one-half hours after death, an autopsy on the body of John Hock was performed by the superintendent of the Manhattan State Hospital, by consent of Jacob Hock, the son and principal beneficiary under the will of John Hock. If Jacob Hock had been fearful of consequences, he would have withheld his assent to such autopsy. Fortunately he did not.

[7] The medical evidence given in by the contestants was, in the main, furnished by the physicians attached to the hospitals. In the course of the examination of the physicians, certain hospital records were allowed to be used by the physician who made them to refresh his recollection, in accordance with the rule that, where shown to be true at the time made and that the witness has no independent recollection of the facts, a memorandum itself may be read in evidence. [8] But the hospital record itself was not allowed in evidence. Such course seems to have been consistent with the authorities on that head. Guy v. Mead, 22 N. Y. 465. It seemed to the surrogate that the records of the hospital were not entitled to be regarded as public records, and to be received as evidence of the facts therein stated. Immediately after this ruling, the case of Levy v. J. L. Mott Iron Works, 127 N. Y. Supp. 506, appeared in the reports; and that adjudication, if known, would have constrained the surrogate in any event to reach the conclusion he had just applied in this cause. But as both parties to the controversy constantly invoked the records of the Manhattan State Hospital, first objecting to them and then insisting on them in turn, they finally consented, upon being reminded of this inconsistency, that the records of the Manhattan State Hospital, including the result of the autopsy, should be received in evidence before the surrogate without objection. This was accordingly done.

[9] In the course of the cross-examination of the medical experts put on the stand by contestants, the proponent's counsel read to the witnesses extracts from medical works of authority, and asked if they did not express opinions different from those testified to by the witness on the stand. Upon the motion of the guardian for infants, the surrogate excluded and struck out parts of these extracts, where the medical witness stated that he did agree with them. It is sometimes the custom on trials of this character to read from medical books written by eminent physicians, and ask whether or not authors whom the witness admitted to be good authority have not expressed opinions different from that given upon the stand. In such cases the reference is not for the purpose of making the statements in the books evidence before a jury, but solely for the purpose of ascertaining the weight to

be given to the testimony of the witness. The extent to which such examination may go has been held discretionary with the court, and that there is no well-founded objection to it. Egan v. Dry Dock, E. B. & B. R. R. Co., 12 App. Div. 556, 570, 571, 42 N. Y. Supp. 188. But the questions and answers in this cause did not always agree strictly with the line of authority mentioned. In some instances portions of medical books were read from by cross-examiner, and witness was asked if he subscribed to such opinions, and he stated that he did. The extracts in question were generally reached by the inductive method.

[10] Now, it is well established that a party calling an expert cannot read from medical works on inductive science, and ask his expert if he agrees with the statements of the author, or if it accords with his experience. Foggett v. Fisher, 23 App. Div. 207, 48 N. Y. Supp. 741; Pahl v. Troy City Ry. Co., 81 App. Div. 308, 81 N. Y. Supp. 46. The distinction is undoubtedly narrow. It is adverted to in McEvoy v. Lommel, 78 App. Div. 324, 80 N. Y. Supp. 71. The surrogate, therefore, struck out all the answers of the experts on the cross-examination which were to the effect that they agreed with the statements of medical authors read to them by the cross-examiner. When the answers were to the effect that the expert witness did not agree with the particular authors read to him, the answers were allowed to stand; but permission was given to recall the medical witnesses, if counsel so elected. This result may not be quite fair to the cross-examiner, as he is bound by unfavorable answers and gets no advantage of the favorable answers of the expert; but the ruling seems to be in line with the authorities quoted. However, in the conclusion arrived at in this cause, the surrogate excluded from consideration the extracts from any medical authority not produced on the stand.

It is now necessary to review briefly the elaborate medical testimony given in on the hearing. The testimony of the physician at Bellevue was to the effect that John Hock was suffering from senile psychosis (which, in the vernacular, is nothing but senile degeneration), and that John Hock, by reason thereof, was of unsound mind on the 8th or 9th of May, 1910. A very able and really learned cross-examination of the medical experts on the part of counsel (more profound than the importance of the cause warranted, as nothing whatever may be affected by the decree, the testator having left apparently no personal property and the land devised by the will being in New Jersey) showed that the physician at Bellevue had little opinion upon the duration of the disorder affecting John Hock. It might according to his testimony, have been of brief duration—indeed, of a duration so brief as not to include the date on which the will propounded was executed.

The physicians at the Manhattan State Hospital were in a good position to give testimony of weight. It appears from their testimony that John Hock was afflicted with a very rare species of tumor in the brain, glioma of the corpus callosum, some 20 instances only of which are known to science. John Hock, however, it is to be noted, died of pneumonia.

The first diagnosis at the Manhattan State Hospital seems to have revealed that John Hock was afflicted with some sort of hemiplegia,

or paralysis; but nothing definite was proved as to its origin, or as to the date it first occurred, and one physician stated on the stand that all of his professional diagnosis amounted to nil, in view of the autopsy on the body of John Hock. The testimony of the Manhattan medical authorities seems to the surrogate to completely nullify the testimony of the Bellevue physician to the effect that John Hock was afflicted with senile dementia, and to establish that John Hock's sole mental malady was occasioned by the tumor before mentioned. The substance of the competent, but very technical, medical testimony given in on the hearing seems, when translated into common speech, to establish the following facts, namely: That a tumor in the brain does not necessarily occasion insanity until the premortal symptoms set in, and that the breakdown from this disorder may be sudden and complete, and at a late stage of the patient's existence. During the progress of the disease, the functions of the brain often adapt themselves to the pressure occasioned by the tumor, and thus ordinary mental conditions may coexist with the various stages of the growth of tumors in the brain. That such is the beneficent course of nature is a matter of common observation, which in ordinary matters could be established without resort to expert testimony. The physicians at Bellevue Hospital would not and did not state that the disease which possessed John Hock in the end had necessarily any retroactive cause, which impaired John Hock's ordinary mental faculties on the day he made his will. Such, it seems to the surrogate, is the effect of the ponderous medical testimony, when translated into the forms of our common speech. It is obvious that the testimony leaves a hiatus or gap in the contestants' testimony which the surrogate is not at liberty to supply by an inference of his own.

The testimony of John Hock's own physician disclosed nothing of any consequence concerning a specific mental malady. To him John Hock was ill, of what he seems to be uncertain. This physician, however, was a therapeutist, and confessedly inexpert on mental disorders; nor did his testimony go to the day the testamentary papers were executed. His general diagnosis and conclusions seem at variance with those of the very learned physicians put on the stand by contestants. These were the witnesses who were unquestionably qualified as experts on mental derangements, and their testimony did not, in my opinion, aid contestants.

[11] It is at this point that we come to an interesting rule of practice. The contestants, who placed on the stand the hospital staff of physicians, now claim that they are not their witnesses, and that they are not bound by their testimony, because such witnesses are among a large number mentioned in a notice and order procured by the contestants themselves under section 2618 of the Code of Civil Procedure. The contestants would have the surrogate ignore the effect of the adverse testimony of any witness named in such notice or order, and resort to other evidence offered on the insanity issue, so as to spell out in that way intestability.

The practice of filing a notice for the examination of witnesses before the surrogate in contested probates, and procuring an order therefor based on such notice, has been for a long period common prac-

tice in this jurisdiction, and it has grown out of all relation to what I conceive to be the true meaning of section 2618 of the Code of Civil Procedure. A contestant, by simply filing a notice for the examination of witnesses or procuring an order to that end, cannot thereby give such witnesses a privileged status.

In this state, probate by the rules of the ecclesiastical courts, which once guided the New York courts of probate, was originally made in two forms, designated as "probate in common form" and "probate in solemn form." Probate in solemn form might be procured by the interposition of a caveat. Goodrich v. Pendleton, 4 Johns. Ch. 549, 552, 558; Vanderheyden v. Reid, Hopk. Ch. 408, reversed Reid v. Vanderheyden; 5 Cow. 720; Bogardus v. Clark, 1 Edw. Ch. 266; Id., 4 Paige, 623; Heyer v. Burger, 1 Hoff. Ch. 1, 12. These cases cited sufficiently indicate the former use of the caveat in probate proceedings in this state. When the original jurisdiction of the old courts of probate devolved wholly on the surrogates, section 11 of chapter 460 of the Laws of 1837 was passed, as a substitute probably for the old caveat. It is extremely doubtful if the act of 1837 was intended to go beyond the old caveat, or do more than bring about a probate more solemn than the ordinary forms of law required. The act of 1837 provided for the examination "of attesting witnesses," after a notice to that end had been served. Two witnesses in common probate sufficed; but after such a notice all the resident witnesses, no matter how many, must be examined. Robertson v. Caw, 3 Barb. 410, 414, Caw v. Robertson, 5 N. Y. 125. This notice, under the act of 1837, was, I think, intended to operate as a caveat, and to have no such extraordinary effect as is now claimed for it.

Chapter 129 of the Laws of 1841, however, increased the scope of section 11 of chapter 460, Laws of 1837, so as to make it apply "to all witnesses whom any person interested in the proof of a will shall request to be examined." These statutes of 1837 and 1841 were ultimately taken into section 2618 of part 2 of the Code of Civil Procedure. The effect of these sections has been since held to inhibit the surrogate from granting probate without the examination of all the witnesses specified in a notice given under section 2618, Code Civ. Proc. Hoyt v. Jackson, 2 Dem. 443, 445, 446; Matter of McGovern, 5 Dem. 424; Matter of Baird, 41 Hun, 89. Such a notice has, therefore, if strictly followed in all cases, become very embarrassing to probate procedure, where neither side produces such witnesses or seeks to examine them.

Surrogate Rollins has held that the duty of producing the witnesses specified in the notice or order under section 2618 falls on proponents, but that whether they are to be examined by proponents or contestants is in the discretion of the surrogate. He has held, also, that, if either party fail to examine such witnesses, it is the duty of the surrogate himself so to do. Hoyt v. Jackson, 2 Dem. 455, 456, 457. The rule stated in Hoyt v. Jackson may be correct. Surrogate Rollins was a probate judge of great distinction and excellence. But, if he is right, why is probate so often allowed in this jurisdiction, after such notice, without the examination of all the witnesses specified in such notice or order? If the statute is as mandatory as it is held in the case last

cited, can there be a constructive waiver of its provisions, and is the defect in the decree of probate, if such witnesses be not examined, cured by section 2473, Code Civ. Proc., except in collateral proceedings? These are very important questions of practice, and they ought to be set at rest, and not left as they now are.

I am inclined to hold for the present, or until it is regularly decided by some competent tribunal to the contrary, that the parties may waive either actually or constructively the necessity of calling any "surrogate's witnesses" not essential to prove the factum of will, and to give to the statute in question such construction as will effectuate what I conceive to be its real end and purpose.

[12] We come now to another important point, made on section 2618, Code Civ. Proc. It is commonly claimed in this jurisdiction that notice and order under section 2618, Code Civ. Proc., makes all the witnesses specified under that section "surrogate's witnesses," whatever that term means. As it is common practice for contestants to place the names of all their witnesses in such a notice or order under section 2618, the effect of such contention, if correct, is that all the contestants' witnesses become surrogate's witnesses, so called. Contestants claim, further, that, being surrogate's witnesses, such witnesses are exempt from all the ordinary rules of evidence. They can be impeached at will, and are not subject to ordinary disabilities. This is evidently the assumption of counsel in Hoyt v. Hoyt, 112 N. Y. 493, 513, 20 N. E. 402; but in that case the opinion of the Court of Appeals lends no support to such claim, and if the objection to the competency of such witnesses had been duly taken in that case below, it is apparent it would have been sustained by the Court of Appeals.

Certainly, when a party, and not the surrogate, calls to the stand the witnesses mentioned in such a notice or order, the party ought not thereby to be relieved from the ordinary rules of examination or evidence usually followed in courts of probate. Until admonished by a higher authority, I will not hold that a party placing a witness other than an attesting witness on the stand can impeach such a witness at pleasure in the Surrogate's Court; nor will I hold that the party so placing the witness on the stand is not bound by the evidence of any witness he calls (excepting in cases of surprise under the ordinary rules of evidence).

[13] The ruling on this point doubtless should be different as to subscribing witnesses, for there the proponent is obliged to call the witness (Estate of Bogert, 4 Civ. Proc. R. 441, 447, affirmed 6 Civ. Proc. R. 128; Matter of Moore, 109 App. Div. 766, 767, 96 N. Y. Supp. 729; Conselyea v. Walker, 2 Dem. 123); and proponent ought not always to be bound by their testimony against the will in such a case, for he may be able to prove the will contrary to the evidence of the attesting witnesses. But in the case of a "surrogate's witness" other than an attesting witness no such reason exists, unless, perhaps, the surrogate suo motu compels the proponent or contestant to examine the witness. Whether the surrogate can, as intimated in Hoyt v. Hoyt, 5 Dem. 432, order proponents to examine hostile witnesses of contestants other than attesting witnesses, because such witnesses are specified by contestants in a notice or order, I have some doubt on con-

stitutional grounds, for then the proceeding ceases to be a trial, and becomes an inquisition.

[14, 15] Now, although a probate is a proceeding in rem, as said in Hoyt v. Hoyt, a contested probate is a trial nevertheless of an issue of fact, and it ought to be subject to the rules of other trials in this state, and the parties to such a cause should have all the privileges and rights accorded to other parties on a trial of an issue of fact.

I myself certainly will not undertake to order proponents, against their will, to examine contestants' witnesses because they are named by contestants in a notice or order procured under section 2618, Code Civ. Proc. If the duty is on the surrogate to examine such witnesses, in default of an examination by the parties, as stated in the cases cited, then the surrogate ought not in any event, in my judgment, to delegate the duty, but he should perform it himself.

[16] In view of what has just been stated, I accordingly hold that the contestants are bound by the testimony of the hospital physicians whom they themselves called to the stand, even though contestants procured the names of such physicians to be placed in a notice and order obtained by them under section 2618, Code Civ. Proc. The testimony of such physicians shows conclusively that John Hock was not necessarily insane on the day he executed the testamentary papers in question, or, rather, it shows that the nature of John Hock's final disorder does not necessarily imply incompetency on the day of the execution of said will. Having thus held, it next becomes the duty of the surrogate to consider the testimony of the lay witnesses called by the contestants to prove irrationality from particular acts or conduct. Such testimony in this cause is of a very trifling nature, and the acts and conduct specified are too insignificant to authorize any conclusion of testator's insanity.

[17] We come now to the contestants' allegation that John Hock was unduly influenced to make the will propounded. It has been pointed out in a decision which commends itself to me, not only because it binds me, but because of its logic, that an allegation of undue influence is inconsistent with an allegation of insanity. Kinne v. Johnson, 60 Barb. 69. Certainly this must be so. Undue influence presupposes some one who in law may be influenced. An insane person, or one non compos mentis, may not, in law, be influenced. The law would take no notice of a charge of influence on a mens insana. The two allegations of insanity and undue influence are absolutely inconsistent. Whether there may be different degrees of compos mentis is, however, questionable. A weakened condition of mind may undoubtedly be considered under an allegation of undue influence; but, in order to make out undue influence, the mind to be acted on and influenced must be sane in law. It must be a legal mind. Whether contestants ought not, in such a case as this, where there is a plain charge of insanity on the one hand and undue influence on the other, to elect which inconsistent issue they will stand on, whether on insanity or undue influence, and not try to prove both, should, perhaps, be considered. A contest based on fraud or undue influence is in itself integral and sufficient, and the allegation may charge and prove weakness of understanding. There are many cases in probate courts which pro-

ceed on the allegation of undue influence alone. Where contestants offer to prove inconsistent allegations, one allegation tends to nullify the other. Yet such is the course taken in this cause and in many others of a like nature.

[18] Irrespective of the inconsistency noted, I find no sufficient evidence to support contestants' allegation of undue influence exerted on and over John Hock in respect to the will propounded in this proceeding. As to the allegation that John Hock was insane or incompetent to make the will in question on the day it was executed, it has not been supported by adequate proofs. Evidence of the weakness of John Hock, his occasional eccentricities on other days than the day of testamentation, are not sufficient in themselves to amount to insanity, or to defeat his testamentary intentions, clearly expressed and duly attested under the statute of wills. To authorize the surrogate to declare insane a testator who has all his long life been sane, because he happens to die of a brain disorder, is a stretch of authority which cannot be sanctioned. Insanity of testator, in order to invalidate a will, should be brought home with precision to the very act of testamentation. Retroactive insanity should not be inferred from a subsequent disorder. The issue in this proceeding is competency or incompetency on the day the will was executed. Such facts are susceptible of proof, and should be proved with precision. This has not been done. The adminicular evidence of proponents, brought in after the contestants had closed, was, on the other hand, precise and conclusive enough to establish that John Hock possessed testamentary capacity on the day he made his will.

That John Hock should leave his little property to the son who lived with him it not unnatural. This son and his children were a part of John Hock's daily care, and a part of the household maintained by him in life, and, so far as John Hock had a human interest, the testimony discloses that it was confined to this household. Certainly there is nothing unnatural or irrational on the face of such a will.

In view of the circumstances of the estate of John Hock given in evidence, the surrogate would have been, perhaps, justified in letting the case stand over, notwithstanding the rule that such matters do not go to the jurisdiction of a probate proceeding. Matter of Davis, 182 N. Y. 468, 75 N. E. 530. Provided the transfers to Jacob are such, the will here operates immediately on nothing. As to the real property of testator, it lies wholly in the state of New Jersey. But, on the insistence of the parties to this cause, it has been heard at great length and with close attention, with the result which I have in this opinion endeavored to indicate.

Let a decision and decree for the probate of the papers propounded as the will and a codicil thereto of John Hock be submitted to me for signature. The guardian of the infants and proponent are entitled to costs.