## LEVY v. J. L. MOTT IRON WORKS.

(Supreme Court, Appellate Division, First Department.   February 3, 1911.)

1. DEATH (§ 58*)—ACTION FOR NEGLIGENT DEATH—BURDEN OF PROOF.

    One suing for negligent death has the burden of proving by a preponderance of competent evidence that the injuries sustained were the proximate cause of death.

    [Ed. Note.—For other cases, see Death, Cent. Dig. § 75–78;  Dec. Dig. § 58.*]

2. EVIDENCE (§ 318*)—HEARSAY EVIDENCE.

    The records of a hospital, made in part by a physician who has no recollection of the case or of any act in connection therewith, and in part by others, not produced, and the testimony of the physician, based entirely on the records, not shown by any testimony to be true, are inadmissible as hearsay.

    [Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 1193–1200;  Dec. Dig. § 318.*]

3. EVIDENCE (§ 157*)—RECORDS—BEST EVIDENCE.

    The records of a hospital, made in part by a physician who has no recollection of the case, and in part by others, not produced, cannot be received in evidence because the best evidence;  there being nothing to show that the entries therein are true.

    [Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 467–470;  Dec. Dig. § 157.*]

4. TRIAL (§ 76*)—EVIDENCE—OBJECTIONS.

    Where a physician testified without objection to facts shown in hospital records, and it did not appear until his cross-examination that he did not testify from recollection, the cross-examining party was not precluded from complaining of the admissibility of the testimony of the physician who relied solely on the records, not shown by any testimony to be correct.

    [Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 183–190;  Dec. Dig. § 76.*]

5. DEATH (§ 76*)—ACTION FOR DEATH—EVIDENCE—PROXIMATE CAUSE—SUFFICIENCY.

    Where the testimony of a physician, in an action for negligent death, as to cause of death, depends entirely on hospital records, not shown by any testimony to be correct, plaintiff, presenting no other evidence, failed to sustain the burden of proving that the injuries complained of were the proximate cause of death.

    [Ed. Note.—For other cases, see Death, Cent. Dig. § 94;  Dec. Dig. § 76.*]

6. EVIDENCE (§ 555*)—OPINION EVIDENCE.

    Where a matter is a proper subject for expert testimony, all the material facts with respect thereto must be shown to render the opinion of an expert admissible.

    [Ed. Note.—For other cases, see Evidence, Cent. Dig. § 2376;  Dec. Dig. § 555.*]

7. APPEAL AND ERROR (§ 1050*)—HARMLESS ERROR—RECEPTION OF EVIDENCE.

    Where the case is a close one on the facts, each party is entitled to have it determined on competent evidence only, and to have nothing improperly injected into the case to his prejudice, and where this is not the case the judgment must be reversed.

    [Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4153–4160;  Dec. Dig. § 1050.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

8. TRIAL (§ 110*)—CONDUCT OF COUNSEL—REFERENCE TO PROTECTION OF DE-
FENDANT BY INSURANCE.
     In an action for the negligent death of a servant, a question asked a
witness for defendant on cross-examination, as to whether he had not told
some one that he had been promised a job by an insurance company if he
testified in the case, was improper in the absence of anything in the rec-
ord accounting for the question except on the theory of getting before
the jury the fact that the action was defended by an insurance company.
     [Ed. Note.—For other cases, see Trial, Cent. Dig. § 271; Dec. Dig. §
110.*]

Appeal from Trial Term, New York County.

Action by Bertha Levy, administratrix of Herman Greenberg, de-
ceased, against the J. L. Mott Iron Works. From a judgment for the
plaintiff and from an order denying a new trial, defendant appeals.
Reversed, and new trial granted.

Argued before INGRAHAM, P. J., and LAUGHLIN, CLARKE,
SCOTT, and MILLER, JJ.

John C. Robinson, for appellant.
Herbert C. Smyth, for respondent.

LAUGHLIN, J.   This is a statutory action to recover for the
death of Herman Greenberg, who was in the employ of the defendant,
and, while in the performance of his duty at its plant, met with an
accident shortly before noon on the 6th day of August, 1904, from
which he sustained a compound fracture of the left femur or thigh
bone, and was taken to the Lincoln Hospital and Home in an ambu-
lance, arriving there at 12:35 a. m., and he was operated on, ether
being administered as an anæsthetic, between that hour and 2 p. m.,
and remained at the hospital, where he died of pneumonia on the
morning of the 10th day of the same month.   We deem the verdict,
which was for $12,000, excessive; but that alone would not neces-
sarily require a new trial.   Although it is possible that the injuries
sustained by the decedent caused the pneumonia and were the proxi-
mate cause of his death, yet plaintiff failed to sustain the burden upon
her of showing this by a preponderance of competent evidence; and
there are also other features of the case which render it proper in the
interests of justice that a new trial should be granted.

The only evidence received relating to the cause of death, other than
the personal injuries, consists of the record of the hospital and the
testimony of Dr. Comte, who was the house surgeon at the hospital
and made a physical examination of the decedent and performed the
operation, but had no personal recollection of the case or of any fact
or circumstance connected with it, and his testimony was based en-
tirely on the hospital records, part of which he made, and part of
which were made by others.   The decedent remained at the hospital
in charge of a nurse but under the immediate supervision, care, and
treatment of Dr. Comte, and of the assistant house surgeon and was
seen from time to time by the visiting surgeon, who died before the
trial.   The assistant house surgeon was in the South at the time of the
trial, and his testimony was not procured; nor was the physician

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

who administered the anæsthetic at the time of the operation, or the nurse or those who made the part of the hospital records of this case not made by Dr. Comte called or accounted for on the trial. Dr. Comte testified, in substance, that, through an oversight on his part or on the part of his assistant, no diagnosis of the case made by either of them and none of the observations subsequent to the operations were entered in the records; and, that owing to this omission, the records did not show whether or not any new complications intervened, or whether the condition in which the decedent was when brought to the hospital had any connection with the pneumonia or with his death, and that it was possible that there was no connection between them.

The hospital records showed that on the physical examination of the decedent before the operation no evidence of disease of the heart, lungs, or abdomen or any organic trouble was found, but that he was found to be poorly nourished, and his temperature was low and pulse weak; that there was a hemorrhage from a lacerated wound on the anterior surface of the thigh about the junction of the lower and middle third; that the wound led through torn muscles to the bone; that at the bottom of the wound loose pieces of bone were found and the broken ends of the femur lapped, producing a shortening of one inch and a half; that at the operation the loose pieces of bone were removed, the fracture set, and muscle and skin properly sewed, and Buck's extension applied to the lower end of the femur; that the patient was very restless the first night and only slept under the influence of hypodermic injections and had bleeding from the seat of the injury; that after the operation his pulse rose and remained very rapid, and his temperature also rose and remained elevated, fluctuating between 101 and 103; that an entry was first made showing that he died of a pulmonary embolus, but this was erased and pneumonia was entered as the cause of death. Dr. Comte testified that according to the custom he or his assistant should have been summoned when the patient was dying and should have entered on a death card from appearances the "most probable diagnosis," from which I infer he means immediate cause of death, and that he made the entry in the record of the case "pulmonary embolus" from such a death card, and that an autopsy was made, but by whom does not appear, which disclosed that death was caused by pneumonia, and it is fairly to be inferred from his testimony that the erasure of the words "pulmonary embolus" was then made and "pneumonia" was entered in the record as the cause of death.

Dr. Comte testified: That he could not say whether he or his assistant made out the death card, which was not produced or accounted for, but that he copied the entry in the hospital records with respect thereto from the death card. That pulmonary embolus means that the individual is suddenly seized with sharp pains in his chest and almost immediately death follows.

"A pulmonary embolus is a plugging up of the pulmonary artery by means of some foreign substance that has got in the circulation some way or other. This foreign substance may come from anywhere in the body as long as it gets into the circulation. Following an injury an embolus may develop. * * * An embolus is either blood clot, a piece of bone, or a piece of mar-

row, or vegetation, that is, something from the heart valve; in fact, something that develops in the body of a foreign nature, that gets into the circulation through perforating a blood vessel, travels around through the circulation, enters the heart, is pumped from the heart into one of the arteries, there irritates the coat, sets up the clot, stops circulation in that part of the body; if it happens to be in the pulmonary artery, death is instantaneous, because all the blood is backed up, cannot enter the lungs."

He further testified that "emboli will develop from fracture often" and will then travel through the system.

It may well be that the jury, aided by this evidence, would have been warranted in finding that the pulmonary embolus was caused by the injuries if there were any competent proof that the decedent had a pulmonary embolus. Kelly v. Wells, 116 App. Div. 758, 102 N. Y. Supp. 223; Hurley v. N. Y. & Brooklyn Brew. Co., 13 App. Div. 167, 43 N. Y. Supp. 259. Not only was the record of that entry canceled, but all of the testimony with respect to it is hearsay evidence and of no probative force and was incompetent and received on objection and exception duly taken by the defendant. Dr. Comte further testified that the rapid pulse and high temperature might be due either to absorption of decomposed or dead tissue or material, or to some acute inflammatory process; that the records did not show which, except as they showed that death resulted from pneumonia; that shock caused by the injury and the ether would be exciting causes to produce pneumonia, and if the pneumonia developed within 24 hours, as was probable from the hospital records with respect to decedent's pulse and temperature, would be competent producing causes; and that the "chances" were that the pneumonia was the result of the anæsthetic due to the lowered general condition of the patient. But he could not say even from the hospital records, and they did not show, that the pneumonia developed within 24 hours. He further testified that a fracture "pure and simple" ought not to be followed by pneumonia unless in the case of an alcoholic patient, which decedent was not, although if too much ether is administered, or it be closely confined and the vapors not allowed to escape, or if it be administered too long, or if the patient be low in vitality from the shock, an irritation of the mucous membrane of the entire respiratory tract from the nose down to the base of the lungs is sometimes caused, which, if continued, sets up congestion "which will afford a field for the introduction of the germ that actually causes the disease."

Here there is no evidence as to the quantity of ether administered nor how long the administration thereof was continued. The hospital records of this case, part of which were made by Dr. Comte and part of which were made by the nurse, and the entries in neither of which were proved to be correct or to have been known by the person making the entry to be correct when entered, were received and read in evidence over objection duly taken by counsel for defendant on the ground, among others, that they were incompetent, hearsay, and not the best evidence, and he duly excepted. The learned counsel for the plaintiff attempts to sustain this ruling on the ground that Dr. Comte had no recollection of the facts, and that his recollection was not refreshed by the records, and therefore they became the best evidence in

so far as they recorded facts within his personal knowledge at the time, and he cites McCarthy v. Meaney, 183 N. Y. 190, 76 N. E. 36, and Howard v. McDonough, 77 N. Y. 592, which are authority for the general rule; but that contention cannot prevail here, for many of the important entries were made by the nurse and are not shown to be true, and there has been no opportunity afforded to cross-examine the nurse with respect thereto, and, even in so far as they were made by Dr. Comte, he was not asked whether he knew them to be correct when entered or whether an inspection thereof refreshed his recollection and enabled him to testify from recollection. Counsel for plaintiff finally draws attention to the fact that Dr. Comte had, before the records were received in evidence, testified to the facts shown in the hospital records to quite an extent without objection, and that therefore the defendant was not prejudiced by their receipt in evidence. It did not appear until the cross-examination that the doctor was not testifying from recollection. The defendant should not be prejudiced because its counsel was not captious in objecting to the testimony of the doctor, which it finally appeared was based entirely on the records. Moreover, the principal difficulty with the case is that the testimony of the doctor, including his testimony of an expert nature, depends entirely on the hospital records as to which there is no presumption of correctness, and we have no evidence that they are correct, and therefore the plaintiff has failed to sustain the burden of proving that the injuries were the proximate cause of death.

The duties of decedent were to operate a freight elevator and to load freight into the elevator and to unload it. At the street floor there was a gate near the opening in the elevator which was held at either end in a groove. When the elevator was at the floor, and access thereto was desired, the gate was slid up perpendicularly by hand and was caught and held by a spring which was released automatically when the elevator went up or down. Just before the accident, the decedent ran the elevator down to this floor, stopped and elevated the gate, and proceeded to wheel a hand truck loaded with an iron tank, which weighed about 450 pounds and had been left within a few feet of the elevator by other employés, onto the elevator by backing toward the elevator and pulling it after him. The cable by which the elevator was operated could be reached at other floors, and evidently some other employé on another floor in the meantime pulled the cable and moved the elevator upward; but the gate did not drop, and the decedent backed into the open elevator shaft and fell to the bottom. The negligence charged against the defendant is failure to discover and repair the spring attached to one of the posts supporting the gate. This spring evidently was a flat narrow strip of steel and was secured to the post at the lower end by three screws in a perpendicular row and some distance apart and extending above the last screw upward and outward from the post with the upper end bent in toward the post in the form of a goose neck, but not attached thereto or coming in contact therewith. When the elevator was at this floor, another strip of iron or steel, also referred to as a spring, attached to it at either end but bulging outward at the middle, pressed against

the spring attached to the post of the gate and pressed the upper end thereof in toward the gate, and another spring attached to the gate proper pressed against this upper end so bent on passing, and when above, being released, sprung outward and caught against the upper end of the spring attached to the post and was held there until released by that spring springing back on the removal of the pressure against it from the spring on the elevator. The theory of the plaintiff is that the spring attached to the post had become loose and had thereby lost its spring and would not, when the elevator moved away from the floor, spring back sufficiently to release the gate. The accident occurred on Saturday. Immediately after the accident, some employés of the defendant lowered the elevator to the floor and the gate came down. If, as contended in behalf of plaintiff, the decedent properly elevated the gate, and it was caught and held by the spring and not released when the elevator went up, then it is difficult to understand how it came down in consequence of the elevator coming down. If it was held by the spring before the spring on the elevator touched the spring holding it, it would seem that it could not then have been released, while the elevator remained at the floor. There was no evidence that the gate ever failed to work properly before, or that any one discovered that the spring was loose before the accident. It and all other appliances of the elevator were regularly inspected. Immediately after the accident, according to the testimony of a police officer and of two employés of defendant, which is not controverted, the elevator was operated, and the gate worked as it was designed to work.

A carpenter employed by defendant at the time of the accident testified that on the following Monday, he thought during the forenoon, but was not sure, he was directed by the superintendent to inspect the elevator, and he discovered that the lowest of the three screws was missing from the spring attached to the gate post, and that the middle screw was loose, and that this left the spring so that he "supposed," but did not know, the spring would not always release the gate. Over objection duly taken that the evidence was incompetent and called for a guess or surmise on the part of the witness, he was permitted to testify as to whether the condition he found had been but recently created, or had existed for some time, and he answered that it might have taken a day and it might have taken three months to loosen the screws, but that he thought it did not take so long because he had repaired the gate and left it in proper repair within a month of the accident. He also testified that trucks backed in there, and frequently backed against the gate, and that, if one backed against it, that would "put it out of commission, it would break it, and also it would loosen the spring in it," and that the condition he found might have been caused "the day before"; and later on he said that he did not think that the screws would work loose in a day, but that he could not tell how long the spring had been loose. It is doubtful whether on any state of facts the question as to how long it would take a screw to work out of a hole is a proper subject for expert testimony, but, if it be, then all material facts with respect to the size

and thread of the screw and the material and its condition and appearance should be shown, and this was not done here. Doubtless the jury, without this opinion of the witness, if they believed his testimony, would have been justified in finding that the condition he described was not produced suddenly, for it was shown that the screw hole presented no appearance to indicate that the screw had been loosened through violence.

The case was weak on the question of defendant's negligence, and it was not very satisfactorily shown that the decedent was free from negligence, for it appears that he could have secured the elevator in place by taking a turn of the check rope around a cleat provided for that purpose, and it also appears that he at times wedged or propped the gate up when it was necessary to have it higher than the spring would hold it, and, although there is no direct evidence that he did that on this occasion, that would fully explain the accident, and it appears that the gate might have thus been released by the elevator coming down after the accident. Both questions, however, were doubtless for the jury, and they were submitted on a charge which very clearly, fully, and fairly presented the issues; but, the case being a close one on the facts, the defendant was entitled to have it determined on competent evidence only and to have nothing improperly injected into the case to its prejudice.

A witness for the defendant was asked on cross-examination, "Did you tell some one out in the corridor a few days ago that you had been promised a job by the Ætna Insurance Company if you testified here?" And on his answering in the negative he was asked, "You positively swear that you did not so state?" To which he again answered in the negative. It would have been proper to have asked the witness, if counsel had information warranting it, whether he had been promised anything for testifying, and, if he denied it, it would have been proper to direct his attention to a particular admission claimed to have been made by him; but there is nothing in the record accounting for these questions except on the theory of getting it before the jury that the action was being defended by an accident insurance company. Counsel for defendant objected to these questions as highly improper; but the court allowed the witness in justice to himself to answer. A request was then made to withdraw a juror, which was denied. The attorney for the plaintiff said nothing to remove the impression unfavorable to the defendant which the questions were calculated to create in the minds of the jurors. Such conduct has often been condemned by this court, and, although it may be a hardship to the client, yet, if attorneys will persist in attempts of this kind to win verdicts by prejudicing the jury, justice to the other party requires that we should freely exercise our authority to grant a new trial.

It follows, therefore, that the judgment and order should be reversed, and a new trial granted, with costs to appellant to abide the event.

CLARKE, SCOTT, and MILLER, JJ., concur.

INGRAHAM, P. J. (concurring).   I concur in the reversal of this judgment upon the ground that the evidence did not establish that the defendant was guilty of negligence.   There was no satisfactory evidence that the gate refused to work because of any defect in the gate itself, or that this loose spring could have held the gate in position after the elevator had been moved.   The evidence shows that the gate worked properly immediately before and after the accident.   Upon the whole evidence, I think it conclusively appeared that the defendant exercised all the care possible to keep this machinery in good order.