In the Matter of Proving the Last Will and Testament of
JANE E. BARNEY, Deceased, as a Will of Real and Personal
Property.

LOUIS V. ENNIS, Proponent, Appellant; WILLIAM D. VAN
RODEN, Contestant, Respondent.

First Department, January 24, 1919.

Will — probate — trial of issue as to competency of testatrix —
evidence of penuriousness or extravagance — when will not an
unnatural one — when question of incompetency one of fact —
appeal — when error in charge or in reception of evidence may
not be disregarded — burden of proof — admissibility of prior
commitment of testatrix to insane asylum — when error in
receiving incompetent evidence not cured — admissibility in
evidence of records of insane asylum — public records — ancient
document rule — evidence of lay witness as to insanity — medical
experts.

Incompetency of a testatrix cannot be predicated solely upon either
penuriousness or extravagance, and such evidence ordinarily can be of
but little or no probative value on the issue of competency.

A will, in which a testatrix followed the plan adopted by her deceased
husband and remembered most of her relatives by small legacies and
then left her residuary estate to one person as he had done, *held*, not to
have been an unnatural will.

In a proceeding for the probate of a will in which the issue is presented as
to whether or not the testatrix was of sound mind and disposing memory
at the time she executed the instrument, if there be more than a mere
scintilla of evidence tending to show incompetency to make a will and
of such a character that different inferences may fairly be drawn there-
from, the case must be decided as one of fact, and if the trial be before
a jury must be left with it.

Evidence in such a case *held* sufficient to present a question of fact for the
determination of the jury, but not to preponderate in favor of the
contestant.

Where the evidence tending to show that a testatrix of advanced age was
incompetent is very weak, no substantial error in the charge or in the
reception of evidence may be disregarded.

An instruction to the jury that the burden of showing by a preponderance
of the evidence that the testatrix was competent at the time she made
the will was on the proponent, is proper, but it is error to instruct them
that if after considering all of the evidence a " doubt " remains in their
minds as to the mental capacity of the testatrix to make a will, they

must answer in the negative the question as to whether she had such capacity, since this instruction may have been thought to require not only proof by a preponderance of evidence, but beyond *any* doubt.

In a civil action the party upon whom the burden of proof rests is only required to bear that burden by the preponderance of the evidence, and he does not bear it if the evidence be evenly balanced.

A commitment of a testatrix to an insane asylum several years prior to the execution of her will being *ex parte*, is not an adjudication or competent to show that she was insane at the time.

Where the surrogate at the request of the counsel for the proponent instructed the jury that the prior commitment of the testatrix was not a legal adjudication that she was at that time insane, but the trial lasted three weeks and the jury were not specifically instructed that the recitals in the commitment were not evidence of the facts, any error in receiving said commitment generally, and permitting it to be read at length to the jury, and recited in the hypothetical question as proof of the facts therein recited was not cured.

Records or case books of an insane asylum relating to a testatrix are not admissible as public records in a proceeding for the probate of a will.

Records and entries therein received in evidence under the ancient document rule must relate not to opinions but to facts presumably within the knowledge of the party making the record or entry, whose death after thirty years is presumed, and concerning which it would have been competent for him to have given testimony, if alive.

Records and entries shown to have been made in the usual course of business at the time of the occurrence to which they relate and pursuant to duty, are, without regard to their antiquity, generally admissible as between third parties on proof of the death of the person who made them.

Recitals in the commitment and records of an insane asylum which constitute narratives of past events and conclusions as distinguished from statements of facts and opinions are inadmissible as evidence.

On the issue of insanity, a lay witness may state what he saw or heard the person whose sanity is in question say or do, and whether what was so done or said impressed him as rational or irrational; and medical experts on mental diseases may go further and give their opinions on acts and conditions observed and found and stated by them or on other facts assumed to be true with respect to the precise mental state of the person and his competency to transact business.

On the issue as to the mental condition of a testatrix neither side should derive any advantage from the fact that a lay witness or a medical expert has died, leaving a record of his observations or opinions concerning the mental state of the person whose competency is in question.

If the commitment of a testatrix to an asylum and her confinement therein is controverted, it is competent to receive the commitment and records of the asylum to show that she was lawfully committed and detained and from those facts the inferences may be drawn that she was of unsound mind during that period, but there is no necessity for resorting to the

ancient document rule, at least not for *opinion evidence* with respect to the competency of a party to make a will thirty years or more after the making of the record of the opinion with respect to her mental condition.

A decree adjudging the testatrix to have been incompetent to make a will and denying probate reversed, and a new trial granted, because of error in the charge with respect to the extent of the burden of proof and the erroneous reception in evidence of the commitment of the testatrix to an asylum and the records therein.

APPEAL by the proponent, Louis V. Ennis, from a decree of the Surrogate's Court of the county of New York, entered in the office of said Surrogate's Court on the 22d day of June, 1916, upon a verdict on settled issues with respect to the competency of the alleged testatrix.

The decree adjudged that the instrument offered for probate was not the last will and testament of the deceased and was executed when she was incompetent to make a will and denied probate.

Appellant further appeals from an order entered in the office of said Surrogate's Court on the 15th day of April, 1916, denying his motion to set aside the verdict herein and for a new trial and for the probate of the said will.

*William Travers Jerome* of counsel [*William C. Relyea* with him on the brief], for the appellant.

*George L. Ingraham* of counsel [*Leonard F. Fish* with him on the brief; *James R. Speers*, attorney], for the respondent.

LAUGHLIN, J.:

The will was offered for probate by the appellant, who was a second cousin of the testatrix, and who was the sole residuary legatee and was designated the sole executor. The other heirs of the testatrix, consisting of two first cousins and sixteen second cousins, were duly cited and appeared, but William D. Van Roden, the respondent, only filed an answer contesting the probate. The issues arising on his answer related to the due execution of the will and to the competency of the testatrix and to whether she executed it free from restraint and undue influence; but on the trial before one of the surrogates and a jury the only issue left

to the jury was as to whether the testatrix was competent to make the will. The points taken on the appeal by the learned counsel for appellant are: (1) That with the exception of expert testimony based on a hypothetical question assuming as facts the recitals in a commitment of the testatrix to an asylum and the entries in the records of the asylum, which he claims should have been excluded as incompetent, there was no evidence presenting a question of fact and, therefore, a verdict in favor of the probate of the will should have been directed, and if not, then the verdict is against the weight of the evidence; (2) that an error was committed in the charge, and (3) that the court erred in receiving said commitment and entries in the records of the asylum.

The alleged will was executed in the borough of Manhattan, New York, on the 4th day of January, 1915, at the office of Lewis S. Gobel, Sr., who was and long had been the attorney for the testatrix, and was witnessed by two members of the bar of some fifteen years' standing, one of whom was his son, who were associated with him in the practice of the law, and by his stenographer. Their testimony with respect to the execution of the will is uncontroverted and shows due execution and that the testatrix came to the office unaccompanied and was apparently of sound mind and memory.

The learned surrogate by consent withdrew from the consideration of the jury all of the issues excepting the fourth which was as to whether Jane E. Barney, the decedent, was of sound mind and disposing memory at the time she executed the paper offered for probate.

The testatrix was born on the 14th day of April, 1835, and she died on the 9th day of November, 1915, at the age of eighty years six months and twenty-five days. At the age of seventeen years and nine months she married Mr. Barney and they remained husband and wife until his death on the 1st day of January, 1900, but had no issue. On the 14th day of March, 1860, at the age of twenty-six years, she was committed to the lunatic asylum, which was a department of the New York Hospital and a private institution, at Bloomingdale, N. Y., by two police justices of the city of New York. At the head of the commitment there is a reference to

the statute* under which it was made as follows: "1st R. St., pp. 633, 4, 5, 8, L. N. Y., 1842, pp. 146, 20, 22," and it is recited therein that it appeared by evidence under oath and in writing of two named physicians that she was insane and that by reason thereof was "so far disordered in her senses as to endanger her own person, or the person or property of others, if permitted to go at large," and that the police justices were satisfied "upon examination" that it would be dangerous to permit her to be at large. The records of the asylum, which with the commitment were received in evidence over the appellant's objection and exception as to their competency, to which reference will presently be made, contain recitals that the duration of her illness prior to her admission to the institution was two months; that "natural organization" was remarked as a predisposing cause and that no exciting cause was known; that her case was diagnosed as "mania," and in the records she is described as "restless, hysterical, fault finding, fastidious," and it is recited that she thought she had heart disease and that she declared that her mother wished to injure her; that she wanted to be with Dr. Van Buren for protection; that she was averse to her husband and wanted to live with a Christian man; that she refused to take medicine on the ground that it might make her more nervous, and that she was "designated as recovered August 14th, 1860," and show that she was discharged on that date after having been there confined for five months. She was again received in the asylum, evidently under the same commitment, on the 14th day of September, 1871, at the age of thirty-seven, and was then confined there until the 6th day of May, 1888, when she was fifty-three years of age, and under that date the records of the asylum contain an entry showing that she was discharged *on trial* and left in the company of her husband and that "the patient was somewhat improved." The commitment and the entries in the records of the asylum and the testimony of Dr. Dold, who attended the testatrix there for a time, constitute the

---

* See R. S. pt. 1, chap. 20, tit. 3, §§ 1, 4, 5, 8; 1 R. S. 634, §§ 1, 4, as amd. by Laws of 1838, chap. 218; 1 R. S. 634, § 5; Id. 635, § 8; Laws of 1842, chap. 135, §§ 20, 22.— [REP.

only evidence relating to her mental condition until about the time of the death of her husband. The entries in the asylum records with respect to her second commitment indicate that they were based in part on observations of the testatrix by some one and in part they constitute narratives of past events with respect to her mental and physical condition and her actions and sayings, and some of them, if true, would indicate mental derangement. The records do not show any diagnosis of her case at the time of her second entry into the asylum, but under date of April 19, 1877, they contain an entry stating that there had been nothing special to note in her case during the past four years and that she had gradually become more quiet and *demented* and that she was rarely untidy or profane and seldom conversed and that she " probably has many delusions and is demented." From that time on until July 22, 1879, the records merely indicate that she was quiet and somewhat gloomy and desirous of being alone and that her health was good and that she slept and ate well, but towards the end became more cheerful; and an entry under the last-mentioned date is to the effect that " she becomes demented; " and under date of November 19, 1880, there is an entry that she was demented and talked to herself in a low tone and occasionally " more loudly and obscenely." Under date of March 29, 1881, there is an entry that she refused to recognize her husband that day, and the entries from about that time until her discharge indicate that she was losing flesh but that she became more industrious and assisted in the kitchen; and under date of May 29, 1883, there is an entry that she had undergone no decided change either physically or mentally for six months; that she was very incoherent and for the most part solitary and quiet but neat in personal habits and assisted in the general house work, in which she manifested great interest, and took outdoor exercise regularly and ate and slept well. On January 16, 1884, there is an entry that she continued quite comfortable and that at times she was pleasant and answered questions in a fairly rational manner, but at other times she " is entirely irrelevant and irritable; " and under date of May 21, 1885, there is an entry that she was unchanged and " grows very incoherent and somewhat excited when it is attempted to con-

First Department, January, 1919. [Vol. 185.

verse with her," and it purports to give some rambling irrational remarks made by her, and states that she talked and scolded to herself. From that time on the entries indicate that her condition both physical and mental was improving progressively and the only reference thereafter to action or conduct on her part which those observing her deemed worthy of note relates to November 27, 1885, wherein it is stated that " mentally there has been no material change, becomes very irrelevant when she attempts to support a continuous conversation," and on May 29, 1886, there is an entry stating that she was generally amiable and industrious but " becomes incoherent and angry at times when addressed," and on September 20, 1886, it is noted that she slapped an attendant who requested her to change her hat to go to church, and on November 29, 1886, it is remarked that she " sits in her room but is very pleasant and talks freely," and that her explanation of *glass blowing* " is very vague and mixed," and the record then continues as follows: " She thinks the water is hard because it contains quicksilver, that the glass ship suspended is a chicken for she has seen a chicken mashed flat by a magician. Is sometimes very cross, talks a great deal of foolishness to herself. General health quite good," which entry purports to be signed by the assistant medical superintendent. After that there are only two entries indicating any irrational condition or conduct on the part of the testatrix, one on the 19th of December, 1887, purporting to have been made by Dr. Dold, which contains the following statement: " Is cheerful, contented and demented. She attends the hops and enjoys them, conducting properly always; works regularly;" and on March 6, 1888, another entry purporting to be made by the same physician stating that when visited by him on the Saturday before she conducted herself remarkably well and conversed very rationally, but that the next day she talked to herself and " was as singular in her actions as usual," and that she did not wish to leave or make any change until warm weather and that " her manner, speech and appearance all indicate a chronic condition of mental aberration."

After her last discharge from the asylum she continued to live with her husband at their house No. 135 West Forty-

fifth street, New York city, winters, and at their country place at Providence, N. J., in the summer time, and after his death she continued to reside at the same place in New York until the spring of 1902, when she moved permanently to the country place in New Jersey, which consisted of a comfortable two-story residence and barn on sixteen acres of land, and continued to reside there until her death. Her husband was a drygoods merchant and had accumulated an estate of upwards of $200,000 which by his will, executed after he had lived with her twelve years following her last discharge from the asylum, with the exception of some legacies of $1,000 each to relatives and two trust funds aggregating $35,000, he left to her unconditionally and named her as executrix with two friends as executors. For the most part of the time after her husband's death she resided alone, but she occupied only the lower part of the house at Providence, N. J., and for all or a considerable part of the period she evidently rented the upper story, and it was occupied for residential purposes. Part of the time she had a servant, but for a large part of the time she had none, and it is to be inferred from the evidence that this was owing to her inability to procure or retain one. None of her relatives, with the exception of the appellant, visited her for a number of years prior to her death. The only companionship she had after the death of her husband appears to have been that of a Mrs. Heroy, who was a deaconess of the Methodist Church, of which the testatrix was a member. The principal testimony with respect to the life of the testatrix during this period was given by Mrs. Heroy, who called on the testatrix in the performance of her duties as deaconess and met her for the first time in September, 1900. Mrs. Heroy, from the time of the first meeting with the testatrix, saw her on an average of three times a week down to the spring of 1902, and about twice a month thereafter until 1911, and stopped with her two weeks each summer, and saw her daily from December 1, 1914, until the end of March thereafter, during which time they both resided at the Deaconess Home in the city of New York, she and the appellant having persuaded the testatrix to come to the city for the winter. This latter period covers the time of the execution of the will. About the end of March, 1915, the

First Department, January, 1919.       [Vol. 185.

testatrix returned to her home at Providence and thereafter Mrs. Heroy saw her about once a month until the eighteenth of September, which was the last time they met. During the course of their acquaintance and friendship they had made trips together to Halifax and to Washington and they corresponded on an average of once in two weeks.

The testimony of Mrs. Heroy indicates that the testatrix was penurious and denied herself comforts which in view of her means she could well have afforded. Doubtless the great majority of people, in the opinion of those who know of their financial circumstances, are either too penurious or too extravagant; but they are dealing with their own and with themselves. Incompetency cannot be predicated solely on either penuriousness or extravagance and such evidence ordinarily can be of but little or no probative value on the issue of competency. But beyond this Mrs. Heroy's testimony tends to show that the testatrix was in some respects peculiar and if her statements to Mrs. Heroy were truthful they indicate that at times, at least, she did not fully comprehend the nature and extent of her fortune. The estate of $200,000 which she received from her husband had increased under her management thereof to upwards of $300,000 and consisted of the place in New Jersey, her former home and two other houses in New York city from which she derived a regular income, and bonds and mortgages, stock and bonds, and she had about $40,000 on deposit with a trust company. According to Mrs. Heroy she complained of being poor, and when ill and requiring the services of a physician, she refused to summon one on the ground that she was too poor, and on one occasion Mrs. Heroy brought this to the attention of the appellant and he sent his own physician to minister to her. Mrs. Heroy's testimony is also to the effect that the testatrix was more or less nervous and talked aloud to herself and habitually broke off conversations with her by abruptly changing the subject, and had a dazed expression in her eyes at times and walked very slowly and was afraid to step onto an elevation, and lived on crackers and milk, cereals and light foods and admitted that she had not had proper food, but when eating elsewhere she partook of ordinary food the same as others. Mrs. Heroy further testified that the testatrix

had about her at Providence a number of cats which she appeared to be fond of but virtually starved, and in effect, that on one occasion she either hid or mislaid some fish that they had purchased at the market and brought home to cook for their supper, and they were unable to find it until after they had made a meal of other food; that on one occasion during the last winter of her life when she stopped at the Deaconess Home she had either in endeavoring to turn out the gas at night, left it on, or, in endeavoring to turn it on, failed to light it, and the room had become filled with gas and she came near being asphyxiated; that at times she was uncleanly in her habits during this period; that on receiving a notice with respect to income tax she was angry and stated that she had no income and wrote a letter, stating that it was a reply to that effect; that on another occasion she had a delusion with respect to a dress, which she erroneously seemed to think Mrs. Heroy was making for her, and on another occasion insisted that a penknife which Mrs. Heroy had left on a table in her room the night before was Mr. Barney's knife; that on another occasion she complained that the appellant had put her in his automobile with his family and that she was frightened and nervous over it and that she did not know what to do and said that " she never wanted him to do anything like that again;" that on another occasion while at the Deaconess Home she had attended a meeting of the stockholders of the Claflin Company, being a stockholder herself, and on returning therefrom seemed to be confused and was unable to narrate anything that had happened; that she complained of having no appetite when her appetite was good, and that she did not seem to be able " to reason anything out;" that she was inclined to be suspicious and thought people were liable to steal and needed watching and was on her guard in the presence of strangers; that before the will was drawn she complained of her attorney, who subsequently drew it, for having advised an investment in a mortgage which she was obliged to foreclose, taking a deficiency judgment, and stated that she would not employ him again; that having sustained a loss of about $10,000 with respect to the Claflin failure on stock in that company which she had received from her husband, she insisted that she had

First Department, January, 1919.　　·　　[Vol. 185.

become a very poor woman, and that she seemed to be unable to sustain a conversation on a subject requiring concentration of thought for any· considerable length of time other than on the subject of her family history and the family history of her husband;ˊthat the testatrix was not a spiritualist but on one occasion she talked to herself in a very loud voice and mentioned Mr. Barney's name and the next morning stated that she knew when Mrs. Heroy went to sleep and said: " I had such an ecstatic feeling — I felt that our spirits were in communion with each other," at which Mrs. Heroy became frightened, and, Mrs. Heroy testified, in effect, thatˊher physical and mental condition underwent a gradual change from the time the witness first knew her, and at times she was weak, apparently from lack of food, and was in that condition when she came to the Deaconess Home in December, 1914, but on receiving proper nourishment became stronger; that she had an aversion for doctors and the witness had difficulty in insisting on calling a doctor on one occasion when the testatrix was ill at her home in New Jersey, and then she would not permit the use of the telephone next door on account of the high rate she claimed would be charged therefor, and the witness was obliged to walk a mile to telephone for a doctor, and she claimed that the doctors had killed her husband and that she " did not want to spend any money " for medical treatment and that she would not have the grass on the lawn cut owing to the fact that she would be charged therefor twenty cents per hour. The witness, with respect to these and other incidents of minor importance, expressed the opinion that the conduct of the testatrix impressed her as irrational. In addition to the correspondence with Mrs. Heroy the testatrix had considerable correspondence with the appellant. Many of her letters were received in evidence and there is nothing in them to justify an inference that she was not of sound mind and on the contrary they tend to show keen intelligence for one of her age. The correspondence indicates that she had been contemplating making a will for some two years before she executed it, and that she ascertained the names and addresses of some of her relatives which she did not know. The appellant was the cashier of a New York bank and it appears that for some years prior to her death

the testatrix consulted him frequently with respect to her investments and entertained a high regard for his opinion and judgment and she appeared to be grateful for the advice and assistance he had given her, and their relations became quite affectionate. Her two first cousins resided in Tennessee, and one was a few years older and the other a few years younger than the testatrix. One of them had children and the other had none. She left a legacy of $1,000 to each of her second cousins with the exception of one, who resided in New Jersey. He did not contest the will and her reason for not remembering him does not appear but it does appear that she knew him well. Her relations were far more close with the appellant than with any other relative and in making her will she apparently followed the plan adopted by her husband, a copy of whose will she had. He had remembered most of his relatives by small legacies, as did she, and then left his residuary estate, which embraced most of it, to one person, as did she. In the circumstances it cannot be said that the will was an unnatural one. The attorney who drew the will died before the trial, and as no one was present at her interview with him in his office three or four days before the will was executed, as a result of which he dictated the will to his stenographer, there is no evidence with respect to what took place at that interview other than the preparation of the will by the attorney in the form in which she subsequently executed it. It appears from the correspondence that she was making memoranda preparatory to making a will, but evidently it was not left with the attorney, for it was not found in his office. Dr. Dold, who had been an interne at Bloomingdale, had in that capacity come in contact with the testatrix during the period from 1882 to 1885, for his name follows some of the entries with respect to her case as early as 1883, but his testimony does not show that he remembered seeing her for more than a year or so of that period. He had, however, after an absence from the institution of about two years, while he was studying mental diseases abroad, returned there and had immediate charge of her case for the last eleven months of her confinement there and he testified, based on his observations at the time and his recollection of her case before, that she was suffering from chronic mania,

which was an incurable mental disorder and is now known as paranoid dementia praecox, and his testimony is to the effect that in his opinion, based on this knowledge of her prior condition without having thereafter seen her, that she was incapable ever thereafter of having a lucid interval and was of unsound mind at the time the will was made and that her apparently competent acts with respect to the management of her property and otherwise were consistent with her having this chronic, incurable, mental disorder. He also gave a like opinion in answer to the hypothetical question embracing the commitment and hospital entries and facts testified to with respect to the history of her case after her last discharge from the asylum.

The well-settled rule in this class of cases is that if there be more than a mere scintilla of evidence tending to show incompetency to make a will and of such a character that different inferences may fairly be drawn therefrom, the case must be decided as one of fact and if the trial be before a jury it must be left with the jury. (*Hagan* v. *Sone*, 174 N. Y. 317.) Aside from the expert testimony in answer to the hypothetical questions, the testimony of Dr. Dold and of Mrs. Heroy and the other testimony, which we do not deem it necessary to set out in this opinion, was sufficient to present a question of fact for the determination of the jury, but it cannot be said to preponderate in favor of the respondent. With the exception of obtaining advice from the appellant and advice and such legal assistance as were required from her attorney, the testatrix managed and looked after her property throughout the entire period from her husband's death, and she evidently exercised sound judgment with respect thereto. The only loss which she incurred as a result of her own investments, if any, is with respect to the mortgage which had to be foreclosed and which evidently was taken on the advice of her attorney, and in the meantime she had increased her estate from $200,000 to upwards of $300,000. Her husband after living with her for twelve years after her last discharge from the asylum and who had full knowledge of all facts relating to her mental condition, then made his will leaving all of his property, with the exceptions stated, to her unconditionally, although he evidently understood that

it might have been left in trust, for his will contains two trusts. That is cogent evidence that he deemed that she had recovered from the mental disease or disability which had rendered her confinement in the asylum necessary. In view of her advanced age the evidence, aside from the expert testimony, tending to show that she was incompetent, is very weak indeed. On this issue of fact no substantial error in the charge or in the reception of evidence may be disregarded. We are of opinion that there were such errors and that the verdict may be due thereto.

The court properly instructed the jury that the burden of showing by a preponderance of the evidence that the testatrix was competent at the time she made the will was on the appellant (*Delafield* v. *Parish*, 25 N. Y. 9), and the jury were so instructed several times in the main charge and on requests to charge. Counsel for the contestant, however, was not satisfied to rest on those instructions and led the court into error by requesting at the close of the main charge that the jury be instructed that if after considering all of the evidence a " doubt " remained in their minds as to the mental capacity of the testatrix to make a will they must answer in the negative the question as to whether she had mental capacity to make the will, and the jury were so instructed and counsel for appellant duly excepted. In the circumstances the jury may have supposed that this was equivalent to an instruction that not only must the plaintiff sustain the burden of proof by a preponderance of evidence, but that this preponderance of evidence must satisfy them beyond a doubt with respect to the mental capacity of the testatrix to make the will. Laymen comprising the jury may well have deemed that the burden went further even than the burden of reasonable doubt in criminal cases and required proof satisfying them not only by a preponderance of evidence, but beyond *any* doubt. It may be that these instructions were given inadvertently by the learned surrogate, but they appear to have been taken from an expression in the opinion of the Court of Appeals in *Delafield* v. *Parish* (*supra*), in which, however, the court was merely considering the sufficiency of the evidence on the trial of the issue *before the surrogate* and was not laying down a rule for the instruction of jurors.

It is also evident, I think, that in that case the " doubt " referred to by the court had reference to a doubt with respect to whether the burden of proof had been sustained by the party on whom it rested; but however that may be, it is now well settled in this jurisdiction that in a civil action the party upon whom the burden of proof rests is only required to bear that burden by a preponderance of the evidence, and while he does not bear it, if the evidence should be deemed evenly balanced, that was not the instruction in the case at bar for the charge contains no reference to the duty of the jury if they should deem the evidence evenly balanced. ( *Kurz* v. *Doerr*, 180 N. Y. 88; *Seybolt* v. *N. Y., L. E. & W. R. Co.*, 95 id. 568; *Kennealy* v. *Westchester Elec. R. Co.*, 86 App. Div. 293; *Tholen* v. *Brooklyn City R. R. Co.*, 10 Misc. Rep. 283; affd., 151 N. Y. 627; *New York Guaranty & Indemnity Co.* v. *Gleason*, 78 id. 503; *Hamel* v. *Brooklyn Heights R. R. Co.*, 59 App. Div. 135.)

The commitment and the records of the asylum were received in evidence generally over the objection duly made and exception duly taken by appellant that they were incompetent as proof of the facts therein recited, and they were read to the jury and were embraced in the hypothetical question upon which medical experts for the contestant expressed the opinion that the testatrix was of unsound mind at the time she made the will. It was undoubtedly competent to show that the testatrix had been so confined in the asylum and the jury might fairly infer therefrom that during that time she was of unsound mind, for apparently there was no effort on her part or on the part of her husband or relatives to obtain her release from the asylum; but the appellant conceded that she was properly so confined and that she was of unsound mind during that time. The commitment was *ex parte* and was, therefore, not an adjudication or competent to show that she was insane at the time. (*Sporza* v. *German Savings Bank*, 192 N. Y. 8, 33; *People ex rel. Peabody* v. *Chanler*, 133 App. Div. 159; affd., 196 N. Y. 525. See, also, *Leggate* v. *Clark*, 111 Mass. 308; *Dewey* v. *Allgaire*, 37 Neb. 6.) The learned surrogate at the request of counsel for the appellant, instructed the jury that the commitment was not a legal adjudication that the testatrix was at that time insane; but the trial lasted

three weeks and the jury were not specifically instructed that the recitals in the commitment were not evidence of the facts. Any error, therefore, in receiving the commitment generally and permitting it to be read at length to the jury and recited in the hypothetical question as proof of the facts therein recited, was not cured. It appears that Bloomingdale Hospital at the times in question was located where Columbia University now stands, and that it was a private institution for the care of persons suffering from nervous and mental disorders, and that the husband of the testatrix paid for her care and treatment there. It does not appear that there was any statute requiring it to keep records until the enactment of section 4 of title 1 of chapter 446 of the Laws of 1874, which was long after many of the entries received in evidence were made. That statute required the superintendent of a State asylum or of a public and private asylum, institution, home or retreat for the care and treatment of the insane, within three days after the reception of a patient, to make or cause to be made a descriptive entry of the case in a book exclusively set apart for that purpose and to make entries therein from time to time with respect to the mental state, bodily condition and medical treatment of such patient and the forms of restraint employed, and when the patient died or was discharged to cause to be stated in the case book " the circumstances appertaining thereto." These statutory provisions were subsequently embodied in the Insanity Law (Gen. Laws, chap. 28 [Laws of 1896, chap. 545], § 70) and re-enacted as section 90 of the present Insanity Law (Consol. Laws, chap. 27; Laws of 1909, chap. 32). Our attention has been drawn to no statutory provision making such case books admissible in evidence excepting on habeas corpus proceedings. (Insanity Law, § 93, as amd. by Laws of 1913, chap. 542.) These records, therefore, were not admissible as *public records* and on no theory, unless it be under the ancient document rule relating to writings made more than thirty years before or on the theory that they were made in the due course of business and the performance of duty by persons who then knew the facts and had no object in erroneously recording them and who had since died, were they admissible as between private parties, as in the case at bar, as proof of the *facts* therein recited (*Buffalo L., T. & S. D. Co.* v. *K. T. & M. M. A. Assn.*, 126

First Department, January, 1919.      [Vol. 185.

N. Y. 450; *Beglin* v. *Metropolitan Life Ins. Co.*, 173 id. 374); but they were not offered or received on the theory that they were public records or that they were made in the due course of duty and that those who made them were dead. They were offered and received solely on the ground that they were ancient documents. The production of the original records was by consent dispensed with and a certified copy thereof was used instead. The only objection interposed by appellant was that the records were incompetent to show the facts therein recited. The objection was overruled and they were received in evidence generally and were read to the jury, and as already stated were embraced in the hypothetical question on which the medical experts expressed their opinions. The recitals in these records, as already seen, showed that the case was originally diagnosed as *mania* and subsequently as chronic mania and a chronic condition of mental aberration. Those evidently were deemed important facts in determining the mental condition of the testatrix when she made the will, and in the hypothetical question they were assumed to be facts. Part but not all of the entries purported to have been made more than thirty years before the trial, but the entries made for the last two years and more of the confinement of the testatrix in the asylum were upon no theory admissible under the ancient document rule, even if the other entries were, and it was not shown that those who made them were dead, and consequently they were not admissible on any theory. The ancient document rule has been quite liberally applied particularly with respect to issues relating to title and the possession of land and to issues involving pedigree and with respect thereto entries and records made by persons in their own interests have been received as proof of the fact, although had they been living, proof could not be made in the form as entered or of the precise facts so entered; but so far as drawn to our attention or we have found, the records and entries, which have been received in evidence under this rule, *related not to opinions but to facts* presumably within the knowledge of the party making the record or entry, whose death after thirty years is presumed, and concerning which it would have been competent for him to have given testimony if living, and this rule dispenses with proof of the execution of wills, deeds and

other documents on proof of their antiquity of thirty years and their production from proper custody without proof of handwriting or of the death of the parties to their execution. (*Hamershlag* v. *Duryea,* 58 App. Div. 288; affd., 172 N. Y. 622; *Dodge* v. *Gallatin,* 130 id. 117; *Coleman* v. *Bruch,* 132 App. Div. 716; *Wynne* v. *Tyrwhitt,* 106 Eng. Rep. [4 B. & Ald. 376] 975; *Bullen* v. *Michel,* 146 Eng. Rep. [2 Price, 399] 136; *McCreary* v. *Coggeshall,* 7 Am. & Eng. Ann. Cas. 693, 700; *Young* v. *Master, etc., of Clare Hall,* 17 Q. B. 529; 17 Cyc. 443; Elliott Ev. §§ 421, 431, 482; Wigm. Ev. 2137; Greenl. Ev. [13th ed.] §§ 138, 141.) Records and entries shown to have been made in the usual course of business at the time of the occurrence to which they relate and pursuant to duty are, without regard to their antiquity, generally admissible as between third parties on proof of the death of the person who made them.     (*State Bank of Pike* v. *Brown,* 165 N. Y. 216; 96 App. Div. 446; affd., 184 N. Y. 517; *Leask* v. *Hoagland,* 205 id. 171; *Matter of Carrington,* 163 App. Div. 546; *Arms* v. *Middleton,* 23 Barb. 571; *Livingston* v. *Arnoux,* 56 N. Y. 507; *Kennedy* v. *Doyle,* 10 Allen [Mass.], 161; *Livingston* v. *Tyler,* 14 Conn. 493; *Hand* v. *Savannah & Charleston R. R. Co.,* 17 S. C. 219; *Poor* v. *Robinson,* 13 Bush, 290; *Sill* v. *Reese,* 47 Cal. 294; *Wood* v. *Coosa & Chattooga R. Co.,* 32 Ga. 273; *People* v. *Hurst,* 41 Mich. 328; *Welsh* v. *Barrett,* 15 Mass. 380; *Nicholls* v. *Webb,* 8 Wheat. 326; *Hancock* v. *Kelly,* 81 Ala. 368; *State* v. *Phair,* 48 Vt. 366; *Dow* v. *Sawyer,* 29 Maine, 117.)     It has also been held in Massachusetts that entries in the records of a hospital in which a party, whose sanity at that time was in issue, was confined, if shown to have been made in the usual course of duty, even though not required to be kept by law, are admissible, evidently under the ancient document rule, as tending to show sanity and in that jurisdiction like entries in hospital records with respect to the injuries from which one brought there was suffering are admissible on proof of the death of the person who made them.     (*Inhabitants of Townsend* v. *Inhabitants of Pepperell,* 99 Mass. 40; *Cashin* v. *New York, etc., R. Co.,* 185 id. 543; *Delaney* v. *Framingham Gas, etc., Power Co.,* 202 id. 359.)     In some jurisdictions the ancient document rule has been applied only to the extent of dispensing with proof of the genuineness of

the document and not as rendering it competent evidence of the *facts* purporting to be shown thereby or recited therein. (17 Cyc. 443; *Gwin* v. *Calegaris*, 139 Cal. 384.)

It is fairly to be inferred that the appellant conceded that the entries in the original records of the asylum, copies of which were received in evidence, were made at the times they purport to have been made and were produced from the proper custody; but he is not estopped from contending, as he does now, that they were incompetent and that if part of them might have been made competent under the ancient document rule, other essential facts necessary to make them competent were not shown. It was not shown that there was any rule or regulation of the asylum requiring that such records be kept or prescribing who should obtain and enter the data, and there was no proof of the handwriting. In many respects the entries are hearsay and do not purport to show facts within the knowledge of the party making them. The only witness called, who was connected with the asylum during either of the periods of the confinement of the testatrix therein, was Dr. Dold. He made some of the entries with respect to her case. Those entries might have been made competent by testimony that he knew them to be correct when they were made and that his recollection so as to enable him to testify with respect thereto was not refreshed by examining them. (See *Levy* v. *Mott Iron Works*, 143 App. Div. 7.) The commitment and records, which were received in evidence generally and read to the jury and recited in the hypothetical question as proof of the facts and opinions therein recited, were, if competent, necessarily very prejudicial to the appellant. On no theory were the recitals therein, which constitute narratives of past events and conclusions as distinguished from statements of facts and opinions, admissible as evidence.

If the entries, in so far as they show what the testatrix said and did while confined in the asylum, should be deemed admissible on the theory that testimony with respect thereto might have been given by the entrant if living — manifestly they could only be received on evidence showing or fairly warranting the inference that such observation and entries were made in the due course of duty. The entries in so far as they purport to show what the testatrix said and did, were

not seriously prejudicial, for the incidents recorded tending to show irrational action are trivial. The entries in the records, however, not with respect to facts, but concerning the opinions formed by some one with respect to the mental condition of the testatrix, consisting of the entry with respect to the diagnosis of her case as mania when she first entered the asylum and relating to the diagnosis of the case from time to time thereafter indicating a continuance of the mental disease until it became chronic, were most prejudicial, for without them all of the testimony given by the experts in answer to the hypothetical question fails. It does not appear who made these entries or who made the diagnosis or whether they were made by competent medical experts. With the exception of the authorities herein cited from Massachusetts, which contain no discussion of the point as to whether there may be a difference concerning the admissibility of documents containing entries constituting records of opinions as distinguished from facts, no authority has been cited and we have found none in which it is held that opinion evidence is admissible under the ancient document rule.

I am of opinion that on an issue such as is here presented the records should not be received as proof of facts recited or opinions recorded therein. If admissible at all they would be received as secondary evidence to show the observations and opinions of those in charge of the testatrix at the asylum and if admissible on that theory they could only be received to the extent that they recite facts and opinions with respect to which it would have been competent for the entrant, if living, to testify. It must be borne in mind that what it is sought to prove by these records is not the fact that there were such records containing such entries, but the *observations and opinions* of the entrant, which, owing to death, can be shown only indirectly. The secondary evidence is not offered to show the performance, either pursuant to law or duty otherwise imposed, of an act by the entrant, such as the date of a birth, baptism, marriage or death, or proof of the performance of duty by a notary or other official. On the issue of insanity a lay witness may state what he saw or heard the person, whose sanity is in question, say or do and

whether what was so done or said impressed him as rational or irrational; and medical experts on mental diseases may go further and give their opinions on acts and conditions observed and found and stated by them or on other facts assumed to be true, with respect to the precise mental state of the person and his competency to transact business. Neither side should, I think, on an issue like that now before the court, derive any advantage from the fact that a lay witness or a medical expert has died, leaving a record of his observations or opinions concerning the mental state of the person whose competency is in question. For aught that appears the other party, but for the death of witnesses who had like opportunities for observation and may have formed opinions to the contrary but who left no written evidence of their observations and opinions, might have been able to meet and overcome such evidence. Therefore, I am of the opinion that the only rule in such cases which is as fair for one as for another is for each party to bear the misfortune incident to the death of a witness who might have testified to observations and opinions relating to the issue of incompetency of the testator to make a will. If the commitment of the testatrix to the asylum and her confinement therein had been controverted, it would, I think, have been competent to receive the commitment and records of the asylum to show that she was lawfully committed and detained and doubtless from those facts the inference might be drawn that she was of unsound mind during that period, but I think there is no necessity for resorting to the ancient document rule, at least not for *opinion* evidence with respect to the competency of a party to make a will thirty years or more after the making of the record of the opinion with respect to his mental condition. There is no opportunity by cross-examination or otherwise to test the accuracy of such recitals or the competency of the entrant to express the opinions. It would seem that the observations of the testatrix by the living during the last thirty years of her life should enable a court or jury to determine whether she was competent to make a will. For these reasons I am of opinion that the commitment and records should not have been received as proof of the facts recited or opinions recorded therein.

The error in the charge with respect to the extent of the burden of proof and the erroneous reception of the commitment and asylum records require a new trial.

It follows, therefore, that the decree and order should be reversed and a new trial granted, with costs to appellant to abide event.

CLARKE, P. J., DOWLING, SMITH and SHEARN, JJ., concurred

Decree and order reversed and new trial ordered, with costs to appellant to abide event.